# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-CA-00726-SCT

*ANTHONY CARR*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/17/2013 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| TRIAL COURT ATTORNEYS: | GLENN S. SWARTZFAGER |
| | LOUWLYNN VANZETTA WILLIAMS |
| | JASON L. DAVIS |
| COURT FROM WHICH APPEALED: | QUITMAN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF CAPITAL POST-CONVICTION |
| | COUNSEL BY: ALEXANDER KASSOFF |
| | JAMILA K. ALEXANDER |
| | LOUWLYNN V. WILLIAMS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JASON L. DAVIS |
| | CAMERON BENTON |
| NATURE OF THE CASE: | CIVIL - POST-CONVICTION RELIEF |
| DISPOSITION: | REVERSED AND REMANDED - 08/11/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.     The Eighth Amendment to the United States Constitution prohibits execution of

persons who are intellectually disabled.[1]  Following a hearing, the Circuit Court of Quitman

---

[1]The terms "intellectually disabled" and "intellectual disability" have replaced "mentally retarded" and "mental retardation" in the professional vernacular. ***Chase v. State***, 171 So. 3d 463, 466 n.1 (Miss. 2015) ("***Chase V***"). This Court uses the new terminology in opinions "except where a quotation necessitates use of the older terminology." ***Id.***

County found that death-row inmate Anthony Carr had failed to prove that he is within that category of persons. We reverse and remand for additional findings by the trial court.

## FACTS AND PROCEDURAL HISTORY

¶2. Just before midnight on February 2, 1990, the Lambert Volunteer Fire Department responded to a call at Carl and Bobbie Jo Parker's home. *Carr v. State*, 655 So. 2d 824, 830 (Miss. 1995) ("*Carr I*"). Firemen found Carl and the Parkers' children, twelve-year-old Gregory and nine-year-old Charlotte, dead inside. *Id.* at 830. Carl and Gregory each had been shot twice. *Id.* at 832. Their feet and ankles were bound, and their wrists were tied behind their backs. *Id.* at 830. Charlotte had been shot three times, and a piece of binding was on her wrists. *Id.* at 830, 832. She was naked from the waist down under her dress, and there was evidence of sexual battery (both vaginally and anally). *Id.* at 830. Bobbie Jo's body was not found until after the fire was extinguished early the next morning. *Id.* She was burned beyond recognition and had been shot once. *Id.* at 830, 832.

¶3. Anthony Carr and Robert Simon Jr. were arrested the next day. *Id.* at 831. After a nine-day trial, Carr was convicted on four counts of capital murder and sentenced to death for each. *Id.* at 832. This Court affirmed his convictions and sentences in 1995. *Id.* at 858.

¶4. In 2004, this Court granted Carr leave to proceed in the circuit court on his post-conviction relief claim that he is intellectually disabled and thus ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002). *Carr v. State*, 873 So. 2d 991 (Miss. 2004) ("*Carr II*"). Following a hearing, the circuit court denied Carr's petition.

¶5. Carr now appeals, raising two issues, which we restate as:

2

I.     Is it unconstitutional for Carr to bear the burden of proof here, when the trial judge found that the question of his intellectual disability was "too close to call"?

II.    Did the circuit court err in holding that Carr is not intellectually disabled?

**DISCUSSION**

¶6.    Before turning to Carr's arguments, we first address briefly the State's argument that Carr's appeal should be dismissed as untimely. The circuit court denied Carr's petition on June 19, 2013. Carr moved for reconsideration under Rules 52(b) and 59(e) of the Mississippi Rules of Civil Procedure on July 2, 2013—one day after the ten-day deadline under those rules. The court denied reconsideration on March 3, 2014, and, eighty-one days later, on May 23, 2014, Carr filed an out-of-time notice of appeal.[2]

¶7.    First, there is no evidence in the record that the State objected or responded to Carr's motion for reconsideration. So the State's challenge to the timeliness of that motion is procedurally barred. Second, while we recognize that Carr's appeal was untimely filed, "[w]e may suspend Rules 2 and 4 'when justice demands' to allow an out-of-time appeal in criminal cases." ***McGruder v. State***, 886 So. 2d 1, 2 (Miss. 2003) (citing ***Fair v. State***, 571 So. 2d 965, 966 (Miss. 1990)).[3] We do so here, because the stakes are significant, and the issues merit review.

---

[2]Carr says that he did not receive notice of the circuit court's order denying reconsideration until May 22, 2014.

[3]Post-conviction proceedings, of course, are civil actions. Miss. Code Ann. § 99-39-7 (Rev. 2015). Yet they are subject to the same terms and conditions as criminal cases for the purposes of appeal. Miss. Code. Ann. § 99-39-25(1) (Rev. 2015).

## I. Is it unconstitutional for Carr to bear the burden of proof here, when the trial judge found that the question of his intellectual disability was "too close to call"?

¶8. After hearing evidence from Carr and from the State, the trial judge found that the question of intellectual disability was "too close to call." But because "[t]here cannot be a tie," the burden of proof became the deciding factor, and the trial judge found that Carr had failed to meet his burden.

¶9. Carr argues that he proved by a preponderance of the evidence that he is intellectually disabled. Without conceding that position, he also insists that, even if there was an evidentiary "tie," the case still must be resolved in his favor. Otherwise, argues Carr, a miscarriage of justice will result because the State will one day execute a person who is just as likely as not intellectually disabled.

¶10. To be clear, Carr is not asking this Court to alter the burden of proof in all *Atkins* cases. Rather, he argues that when the evidence of intellectual disability is an "actual tie"—as the trial judge found here—the State must then bear the risk of error because the possible injury to the petitioner (i.e., death) is far greater than the possible harm, if any, to the State. According to Carr, the social harm in executing someone who could be intellectually disabled, combined with the value that society places on individual liberty, requires the State to bear the risk. Moreover, argues Carr, imposing the risk of error on the State is consistent with the "heightened scrutiny" applied in death-penalty cases.

¶11. The State argues first that this issue is procedurally barred because Carr failed to raise it before the circuit court. We agree. *See, e.g.*, ***Evans v. State***, 725 So. 2d 613, 632 (Miss. 1997) (collecting authorities). Carr claims it was impossible for him to do so "until the

4

circuit court issued its order declaring the outcome of the hearing a tie." But while that may be true, Carr could have raised the issue in his motion for reconsideration.

¶12.    Procedural bar notwithstanding, we find also that this claim lacks merit. As the State points out, the burden of proof in *Atkins* cases is well-settled.[4] And simply put, neither the Eighth Amendment nor the Due Process Clause requires that the State bear the burden here.

¶13.    Carr's argument could be interpreted two ways. On one hand, he seems to argue that allocating the burden of proof to him under these facts violates his substantive Eighth Amendment right against cruel and unusual punishment. But the United States Supreme Court has never held nor even implied that a burden of proof alone can "so wholly burden an Eighth Amendment right as to eviscerate or deny the right." *Hill v. Humphrey*, 662 F.3d 1335, 1351 (11th Cir. 2011) (emphasis omitted); *see also Hall v. Florida*, 134 S. Ct. 1986, 2011, 188 L. Ed. 2d 1007 (2014) (Alito, J., dissenting) ("As [the petitioner] concedes, the Eighth Amendment permits States to assign to a defendant the burden of establishing intellectual disability by at least a preponderance of the evidence.").

¶14.    A second interpretation of Carr's argument implicates due process rather than the Eighth Amendment. In effect, he argues that it is simply unfair to require petitioners to bear the burden of proof when the question of intellectual disability is "too close to call." We note first that this argument is completely unsupported by any authority. A party either bears the

---

[4]*See, e.g.*, *Dickerson v. State*, 175 So. 3d 8, 23 (Miss. 2015); *Brown v. State*, 168 So. 3d 884, 891 (Miss. 2015); *Goodin v. State*, 102 So. 3d 1102, 1116 (Miss. 2012); *Thorson v. State*, 76 So. 3d 667, 676 (Miss. 2011); *King v. State*, 23 So. 3d 1067, 1075 (Miss. 2009); *Doss v. State*, 19 So. 3d 690, 714-15 (Miss. 2009); *Chase v. State*, 873 So. 2d 1013, 1029 (Miss. 2004).

burden of proof or it does not. Stated differently, the burden of proof is not somehow allocated once the evidence has been presented.

¶15. And importantly, *Atkins* did not establish a burden of proof. Nor did it provide definitive procedural or substantive guides for determining who is intellectually disabled. ***Bobby v. Bies***, 556 U.S. 825, 831, 129 S. Ct. 2145, 2150, 173 L. Ed. 2d 1173 (2009). Instead, consistent with its approach to insanity in ***Ford v. Wainwright***, 477 U.S. 399, 405, 416–17, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986), the United States Supreme Court left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." ***Atkins***, 536 U.S. at 317.

¶16. States generally reserve the power to set burdens of proof unless their standard offends some fundamental principle of justice:

> [I]t is normally "within the power of the State to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion," and its decision in this regard is not subject to proscription under the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."

***Medina v. California***, 505 U.S. 437, 445, 112 S. Ct. 2572, 2577, 120 L. Ed. 2d 353 (1992) (quoting ***Patterson v. New York***, 432 U.S. 197, 201–02, 97 S. Ct. 2319, 2322, 53 L. Ed. 2d 281 (1977)). So when analyzing whether a burden of proof offends a "fundamental principle of justice," courts must consider historical practice and whether the burden violates a recognized principle of "fundamental fairness" in its operation. ***Medina***, 505 U.S. at 446-48. But there is no historical prohibition on executing the intellectually disabled. ***Atkins*** was

based on society's "evolving standards of decency," not historical tradition. *Atkins*, 536 U.S. at 321; *Hill*, 662 F.3d at 1350.

¶17.    And while some states have not expressly assigned a burden of proof in intellectual disability cases, "[a]ll of the states that have expressly assigned a burden of proof regarding mental retardation have assigned this burden to the defendant."  Peggy M. Tobolowsky, *Atkins Aftermath: Identifying Mentally Retarded Offenders and Excluding Them from Execution*, 30 J. Legis. 77, 118 (2003); *see also Hill*, 662 F.3d at 1355; *State v. Jimenez*, 188 N.J. 390, 402, 908 A.2d 181, 188 (2006); *opinion clarified*, 191 N.J. 453, 924 A.2d 513 (2007).  Simply put, the Constitution does not require that the State bear the burden of proof in intellectual disability cases. *United States v. Webster*, 421 F.3d 308, 311 (5th Cir. 2005).

¶18.    Finally, Carr has cited no authority to support his assertion that the burden of proof should shift to the State when a case is close.  It is telling that Carr cites a veteran's-disability case to support the standard he advances.  As the Eleventh Circuit Court of Appeals said in *Hill*:

> A third critical flaw in Hill's argument is that *a risk of error exists with any burden of proof.* Every standard of proof allocates some risk of an erroneous factual determination to the defendant and therefore presents some risk that mentally retarded offenders will be executed in violation of *Atkins* . . . .
>
> *The necessary result of Hill's reasoning is that the burden of proof must be placed on the state and that the state must prove beyond any doubt that an offender is not mentally retarded. No state uses that standard. The effective result of Hill's argument, then, is that every state's death penalty statute or case law procedure is unconstitutional* because none of them requires the state to prove the absence of mental retardation beyond a reasonable doubt. Or, to take Hill's argument to its logical conclusion, beyond all doubt . . . .

*Hill*, 662 F.3d 1335, 1355-56 (emphasis added).

¶19. In sum, we find that Carr's burden-of-proof argument lacks merit. The difficulty in ascertaining where the truth lies may be a reason *for* placing the burden of proof on the proponent of an issue. *Cooper v. Oklahoma*, 517 U.S. 348, 366, 116 S. Ct. 1373, 1384, 134 L. Ed. 2d 498 (1996). The effect of Carr's proposal would be to prohibit the execution of anyone who is even arguably intellectually disabled. Neither the Eighth Amendment nor the Due Process Clause require such a rule.

¶20. So having determined that Carr's burden of proof is not unconstitutional, we turn now to his second issue on appeal and the evidence presented to the circuit judge.

II. **Did the circuit court err in holding that Carr is not intellectually disabled?**

A. Intellectual disability requires significantly subaverage intellectual functioning, significant deficits in adaptive behavior, and manifestation of both before age eighteen.

¶21. In *Chase v. State*, this Court "recognize[d] developments in the field of assessing intellectual disability that have manifested since *Atkins* and *Chase*." *Chase v. State*, 171 So. 3d 463, 469 (Miss. 2015) ("*Chase V*"). This Court noted that, in 2004, it had adopted the American Association on Mental Retardation's (AAMR) and the American Psychiatric Association's (APA) definitions of intellectual disability cited in *Atkins*. *Id.* at 471. This Court then took the opportunity to "adopt the 2010 AAIDD and 2013 APA definitions of intellectual disability as appropriate for use to determine intellectual disability in the courts of this state in addition to the definitions promulgated in *Atkins* and *Chase*." *Id.*

¶22. The American Association on Intellectual and Developmental Disability (formerly the AAMR) defines intellectual disability as a condition originating before age eighteen

8

"characterized by significant limitations in both intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills." *Id.* at 469 (citations omitted). Significant deficits in one of the three adaptive-functioning domains are required:

> The conceptual skills domain includes "language; reading and writing; and money, time, and number concepts." The social skills domain includes "interpersonal skills, social responsibility, self-esteem, gullibility, naivete (i.e., wariness), follows rules/obeys laws, avoids being victimized, and social problem solving." The practical skills domain includes "activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone.

*Chase V*, 171 So. 3d at 469 (internal citations omitted).

¶23. And the APA defines intellectual disability as "a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains." *Id.* (citations omitted). Individuals must have significant deficits in one of the three domains:

> The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problems solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others.

*Id.* at 469–70.

¶24. Ultimately though, the exact wording of the above standards "makes little substantive difference." *Id.* at 470. All are similar and require the same three basic elements: "significantly subaverage intellectual functioning, significant deficits in adaptive behavior,

9

and manifestation before age eighteen." *Id.* An assessment of intellectual disability must be retrospective to the time of the crime and before the petitioner turned eighteen. *Id.* at 468 (citing *Goodin*, 102 So. 3d at 1115).

¶25.    Recently, in *Hall v. Florida*, the United States Supreme Court analyzed Florida's capital sentencing scheme as it pertains to intellectually disabled persons. *Hall v. Florida*, 134 S. Ct. 1986, 188 L. Ed.2d 1007 (2014). Florida's Supreme Court had interpreted Florida's statute very strictly, such that a person whose IQ test score is above 70—including a score within the margin of error[5]—"does not have an intellectual disability and is *barred* from presenting other evidence that would show his faculties are limited." *Id.* at 1994 (emphasis added).

¶26.    In finding that interpretation unconstitutional, the United States Supreme Court said

> Florida's rule disregards established medical practice in two interrelated ways. It takes an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence. It also relies on a purportedly scientific measurement of the defendant's abilities, his IQ score, while refusing to recognize that the score is, on its own terms, imprecise.
> . . . .
> Intellectual disability is a condition, not a number. Courts must recognize, as does the medical community, that the IQ test is imprecise. This is not to say that an IQ test score is unhelpful. It is of considerable significance, as the medical community recognizes. But in using these scores to assess a defendant's eligibility for the death penalty, a State must afford these test scores the same studied skepticism that those who design and use the tests do,

---

[5]"Each IQ test has a 'standard error of measurement' . . . often referred to by the abbreviation 'SEM.'" *Hall*, 134 S. Ct. at 1995. "A score of 71, for instance, is generally considered to reflect a range between 66 and 76 with 95% confidence and a range of 68.5 and 73.5 with a 68% confidence. See DSM–5, at 37 ('Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points) . . . .[T]his involves a score of 65–75 (70 ± 5)')." *Id.*

and understand that an IQ test score represents a range rather than a fixed number. A State that ignores the inherent imprecision of these tests risks executing a person who suffers from intellectual disability.

This Court agrees with the medical experts that *when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.*

*It is not sound to view a single factor as dispositive of a conjunctive and interrelated assessment.* See DSM–5, at 37 ("[A] person with an IQ score above 70 may have such *severe* adaptive behavior problems . . . . that the person's actual functioning is comparable to that of individuals with a lower IQ score").
. . . .
By failing to take into account the standard error of measurement, Florida's law not only contradicts the test's own design but also bars an essential part of a sentencing court's inquiry into adaptive functioning. *Freddie Lee Hall may or may not be intellectually disabled, but the law requires that he have the opportunity to present evidence of his intellectual disability, including deficits in adaptive functioning over his lifetime.*

*Id.* at 1995; 2001 (citations omitted) (emphasis added).

### B.  Pre-Hearing Assessment by the Mississippi State Hospital.

¶27.   In 2009, Drs. Gilbert S. Macvaugh III and Reb McMichael and their team at the Mississippi State Hospital evaluated forty-four-year-old Carr.  Carr's expert, Dr. C.  Gerald O'Brien, did not interview Carr or assess him personally, but he relied on the State Hospital team's assessment when forming his opinion about Carr's intellectual functioning.

¶28.   To assess Carr's intellectual functioning, the team considered three intelligence tests. The earliest took place in 1990 in the context of a pretrial forensic mental evaluation.  Dr. William M. Kallman administered then-twenty-five-year-old Carr the Wechsler Adult

11

Intelligence Scale–Revised (WAIS–R).[6]  Carr's full-scale intelligence quotient (IQ) score was 70, putting him in "the mildly mentally retarded range."  Dr. Kallman did not administer a test for malingering.  He noted that Carr "may have exaggerated his psychological distress somewhat," but considered the evaluation a "valid indicator" of Carr's cognitive functioning and saw "no signs of malingering or intentional efforts to distort the data."

¶29.    The State Hospital team administered two intelligence tests: the Wechsler Adult Intelligence Scale–Fourth Edition (WAIS–IV) and the Stanford-Binet Intelligence Scales, Fifth Edition (SB–5).  Carr's full-scale IQ score on the WAIS–IV was 72.  Given test error, there was a ninety-five-percent chance that his "true" full-scale IQ score fell between 68 and 77.  He scored 70 on Verbal Comprehension, 75 on Perceptual Reasoning, 89 on Working Memory, and 79 on Processing Speed.

¶30.    On the SB–5, Carr's full-scale IQ score was 75.  Given test error, there was a ninety-five-percent chance that his "true" full-scale IQ score was between 72 and 80.  He scored 71 on Fluid Reasoning, 72 on Knowledge, 81 on Quantitative Reasoning, 82 on Visual Spatial, and 89 on Working Memory.

¶31.    The State Hospital team also administered two tests for malingering, the Rey 15-Item Memory Test and the Test of Memory Malingering (TOMM), and neither test suggested that Carr was malingering.  Based on Carr's test behavior and his performance on the malingering measures, the State Hospital team considered the WAIS–IV and SB–5 scores to be "valid estimates of his true intellectual ability."

---

[6]But the raw data from this testing was not available for review by the State Hospital team or by Dr. O'Brien.

¶32. In terms of intellectual functioning, the State Hospital team concluded that Carr was "at worst, functioning in the upper portion of the mild range of mental retardation; or at best, the lower portion of the borderline range of intellectual ability":

> When considering the consistency in . . . Carr's Full Scale IQ scores over time and across different instruments (i.e., WAIS–R = 70, WAIS–IV= 72; SB–5 = 75), this seems to suggest that he is likely functioning in the low borderline range of intellectual ability. However, because of the error associated with all intelligence tests (plus or minus five points), and because IQ scores become artificially inflated over time (Flynn Effect), Mr. Carr's IQ scores on the tests that we administered to him do not necessarily rule out the possibility of the diagnosis of mild mental retardation.

For adaptive deficits, the State Hospital team said Carr "may have demonstrated significant limitations in at least two areas of adaptive behavior before the age of 18 (i.e., functional academics and work)."

¶33. Evidence regarding functional academics conflicted. On one hand, school records showed that Carr had failed third, seventh, and ninth grades. He dropped out after his second attempt at ninth grade. And his grades were always "quite poor," ranging from failing to barely passing. On the other hand, Carr's absences were excessive, as he missed from twenty-five to forty-seven days each year.

¶34. Despite Carr's excessive absences, achievement-test data suggested he "probably demonstrated adaptive behavior deficits in the area of functional academics prior to the age of 18." His eighth-grade achievement-test scores ranged from first to thirty-sixth percentile. He scored similarly on achievement testing done by Dr. Kallman in 1990, achieving third- and fourth-grade levels in reading, spelling, and math.

¶35. The State Hospital team could not determine if Carr had adaptive deficits in the area of employment. His work history was contradictory and inconsistent. The State Hospital team also noted limited, inconsistent information concerning Carr's adaptive functioning in the community before his arrest at age twenty-five. Family members who were interviewed all described Carr as having both intellectual and adaptive behavior deficits. But the State Hospital team noted in its report that "concerns exist with regard to the reliability of the information obtained from these family members."[7]

¶36. The State Hospital team interviewed one of Carr's former teachers, Cedonia Hunt, and included information from her in its report:

> Hunt reported that she taught Mr. Carr "sometime in the late 70's." She taught him in both "fifth and the sixth grades." She also stated that he was in her "homeroom" in grade six. She is currently 63 years of age and has been retired as a schoolteacher for the last fourteen years.

> Asked how well she remembered Mr. Carr, she replied, "Pretty well." Asked if she had ever worked with students diagnosed with mental retardation, she replied, "Yeah." She then noted, "I don't think he was mentally retarded . . . he was slow but not retarded."

> Asked what type of student Mr. Carr was in her classes, she replied, "Poor." Asked what was this cause for this, she replied, "Home environment and basically didn't want to do it. . . [.] I felt he could do better." Asked if he got into trouble during his school years, she replied, "As far as I can remember, yeah, fights and not paying attention." Asked if he missed a lot of school, she replied, "A lot, made D's in most subjects but because of his age, we decided to move him on because smaller children he would be with." Asked if he was ever in any kind of Special Education classes, she replied, "Not that I know of . . . I always knew that he could have done better . . . it was the environment, the people he was around."

---

[7]Dr. Macvaugh noted during his testimony that family members "may have far more influence or pressure to sway the direction of their descriptions in one way or the other," and that his "index of scepticism is increased" when determining their reliability.

Asked if she thought he had mental retardation, she replied, "I don't think he was . . . he might have had a learning disability." Asked if Special Education services were available for students at that time in that school, she replied, "Yes."

The State Hospital team considered Hunt's reliability to be good.

¶37.   After considering all the information compiled in its fifty-eight-page report, the State Hospital team could not "offer an opinion to a reasonable degree of psychological and psychiatric certainty."  It summarized its assessment as follows:

> In summary, Mr. Carr does, in our opinion, have intellectual limitations and may very well have met the diagnostic criteria for mental retardation before the age of 18. However, we cannot be certain of this because he never received intelligence testing or a standardized assessment of his adaptive functioning before age 18. The only known prior intelligence testing was administered to him by Dr. Kallman within the context of a pre-trial forensic evaluation following his arrest at the age of 25. Dr. Kallman's evaluation suggested that Mr. Carr may have been exaggerating symptoms of mental illness at the time but did not include an assessment of whether or not he may also have been fabricating or exaggerating intellectual deficits at that time as well.
>
> During our evaluation of him, Mr. Carr scored slightly higher on the intelligence testing that we administered to him, suggesting that he is likely functioning in the borderline range of intelligence, as opposed to the mildly mentally retarded range. Similarly, on the achievement testing that we administered to him, Mr. Carr scored somewhat better compared to his achievement test scores when administered similar testing in 1990 by Dr. Kallman, which suggests that Mr. Carr's functional academic abilities are not currently impaired to the extent that Dr. Kallman described during his evaluation of Mr. Carr nearly 20 years ago.
>
> According to all of the professional definitions of, and formal diagnostic criteria for, the diagnosis of mental retardation, there must be evidence of manifestation of the disability during the developmental period (i.e., onset before the age of 18). Also according to the professional definitions, a person with mental retardation may, over time and with proper supports, improve in his or her functioning to the point that they no longer meet the diagnostic criteria for the disability. It is difficult to determine in Mr. Carr's case whether or not his functioning prior to the age of 18 actually indicated that he had mental retardation. There were some data to suggest that had he been properly

15

evaluated for this, he may have received a diagnosis of mental retardation at that time. There also were some data to suggest that he may not have qualified for this diagnosis before the age of 18. Because of these contradictory data, we are unable to state definitively a retrospective opinion to a reasonable degree of psychological and psychiatric certainty that Mr. Carr was not mentally retarded before the age of 18.

In our opinion, Mr. Carr did not appear to be mentally retarded at the time of our evaluation of him. However, our assessment of his more recent functioning, particularly his adaptive behavior over the course of his adult years while on death row, is confounded by how well he appears to function within the structure of a prison environment. Moreover, how well a person functions in prison is a poor index of what his actual level of functioning may be in the community, which is more relevant for making a diagnosis of mental retardation.

### C. The circuit court heard conflicting evidence at the hearing.

¶38. Three witnesses testified at the *Atkins* hearing: former neighbor Johnie Chaney and Dr. O'Brien for Carr, and Dr. Macvaugh for the State.

¶39. At age fourteen, Chaney moved into a house near Carr's. Chaney could not recall Carr's age at that time and conceded that Carr was possibly older than eighteen. The two knew each other and played games and sports together, including basketball and softball. In softball, Carr played in the outfield and did well at that position. "I told him to run and catch [the ball]," Chaney said, and Carr did so after receiving Chaney's instruction.

¶40. Chaney described Carr as a "follower" and said Carr had personal hygiene problems on occasion. "[Carr] came around me a couple of times and he had a odor to him," and Chaney would tell Carr to "freshen up." Chaney also helped Carr with his clothes and shoes. "I used to help [Carr], you know, keep his clothes right on him and tell him about his shoes. He would leave his shoes and things all untied, you know, stuff like that," Chaney explained.

16

¶41. Dr. O'Brien found to a reasonable degree of certainty that Carr was intellectually disabled. Dr. O'Brien reviewed the same data as the State Hospital team, plus Carr's fourth- and fifth-grade-level scoring on the Woodcock-Johnson III achievement test administered by Dr. Victoria Swanson in 2010. But Dr. O'Brien neither tested Carr nor evaluated him, nor did he interview any collateral sources. A paralegal in his office did follow-up interviews with a couple of collateral sources.

¶42. Dr. O'Brien found that Carr met the intellectual-deficit criterion based on the "ability testing" done by Dr. Kallman and the State Hospital team, which Dr. Swanson's testing corroborated. "[O]rdinarily an IQ score up to 75 is considered significantly subaverage," Dr. O'Brien said. He did not question the validity of Dr. Kallman's testing, but he did have some concern about not having Dr. Kallman's raw test data. He said he did not like relying on intelligence tests without having such data, but he chose to take Dr. Kallman's testing as reported because the data simply was unavailable.

¶43. On cross-examination, the State questioned Dr. O'Brien about why his report had omitted Carr's 89 Working Memory and 79 Processing Speed Index Scores on the WAIS–IV. Dr. O'Brien said he omitted those scores because he had no prior testing with which to compare them. "The only things I included in my little chart were those that could be at least roughly compared with previous tests results," he explained. In his view, the 79 Processing Speed Index Score was "not particularly significant." Yet he acknowledged that the 89 Working Memory Index Score "could be" contraindicative of intellectual disability.

¶44. For adaptive deficits, Dr. O'Brien conducted a retrospective analysis and found deficits in all three domains (conceptual, social, and practical) and in eight of the ten skill

17

areas (communication; functional academics; self-direction; leisure; social skills; home living; health and safety; and self-care).

¶45.  In considering onset before age eighteen, Dr. O'Brien relied primarily on Carr's school records and Hunt's statements corroborating that Carr had performed poorly in school. Carr failed three grades and, according to Hunt, was moved from sixth to seventh grade only because of his size.  While acknowledging that Carr's absences could have contributed to his poor performance, Dr. O'Brien did not give that factor much weight.[8]  In Dr. O'Brien's view, school records reflect that Carr began reaching his peak academic potential by about the third grade.

¶46.  Dr. O'Brien did not see Carr's lack of placement in special education as significant. Though Hunt said special-education services were available, Dr. O'Brien's research showed that was unlikely based on the laws in effect at that time.  He also questioned Hunt's memory: she said she had taught Carr in fifth and sixth grades, but records showed she taught him in sixth grade only.  Regardless, Dr. O'Brien saw Carr's actual performance in school (which was poor) as more important than whether or not Carr was in special-education classes.

¶47.  Dr. O'Brien also discounted Hunt's opinion that Carr might have had a learning disability as opposed to being intellectually disabled.  A learning disability, Dr. O'Brien explained, implies a deficiency in one or two subjects.  But Carr's scores or grades all were

---

[8] He explained his rationale for that as follows:  First, Carr missed approximately the same number of days in first and second grades as he did in other years; yet he performed better in those first two grades.  Second, Carr performed slightly better when he repeated third grade despite missing approximately the same number of days as he did in his first attempt at that grade.

low. Moreover, diagnosis of a learning disability requires formal testing. Dr. O'Brien testified further that Carr's achievement-test scores showed "significantly subaverage performance." In eighth grade, at age fifteen, Carr scored in the tenth percentile on the California Achievement Test. Dr. O'Brien noted that Carr's thirty-sixth-percentile score in Spelling on that test was "amazingly high" given his scores in other areas. Dr. O'Brien viewed that score and Carr's thirty-fourth-percentile score in Math Computation as outliers.

¶48. The State challenged Dr. O'Brien about his failure to include any information in his report that was contrary to his opinion. Dr. O'Brien replied that his report was designed to be brief and that, in his view, the conflicting data was unsubstantial and did not merit mention:

> I don't believe there are significant warnings and cautions that should [have been included]. I believe there are a number of items within the test data, for example, that are not particularly consistent. However, they are not substantial and significant. There are dozens and dozens of scores that are essentially consistent with his level of functioning as we've talked about it. There are a handful that aren't. I don't think the handful warrants me making a note in this report.

¶49. While conceding that Carr has intellectual limitations, Dr. Macvaugh was unable to offer an opinion to a reasonable degree of psychological certainty that Carr is intellectually disabled. Dr. Macvaugh, testified that "[t]here are data, in my opinion, that suggest that Mr. Carr might have mental retardation, and there are data to suggest he might not."

¶50. In Dr. Macvaugh's opinion, Carr does not currently satisfy the intellectual-deficit criterion. At the same time, he could not rule out the possibility:

> We had conflicting data as to the intellectual impairment prong. Based on our test in August of 2009, he scored a little north of where someone with mild [intellectual disability] would ordinarily score. However, considering test

19

error, the Flynn [E]ffect, the other issues . . . that could potentially affect the validity of test scores, it's possible that he might be in that range that's consistent. He is in that zone of ambiguity.

Dr. Macvaugh testified that Carr was "essentially in that what we call the zone of ambiguity with these IQ test scores. They're all fairly close and fairly consistent. They're all technically at or above the cutoff." Dr. Macvaugh also said that Carr's tests were within the margin of error.

¶51. Dr. Macvaugh interpreted the 89 Working Memory and 79 Processing Speed Index Scores on the WAIS–IV differently than Dr. O'Brien. In his opinion, both scores were inconsistent with intellectual disability. Dr. Macvaugh also found Carr's score of seven on Arithmetic within the Working Memory Index Score to be "significant." Further, Dr. Macvaugh said that Carr's 81 in Quantitative Reasoning (tenth percentile), 82 in Visual Spatial (twelfth percentile), and 89 in Working Memory (twenty-third percentile) were "noteworthy."

¶52. This data left Dr. Macvaugh unable to form an opinion to a reasonable degree of confidence as to whether Carr had intellectual deficits before age eighteen. Dr. Macvaugh saw Dr. Kallman's testing as pivotal:

> If that [IQ] score is valid, the 70 from Dr. Kallman from 1990, [Carr] is certainly within range. Excluding a discussion of error. But I don't know that it's valid. And that's the closest score in terms of the nexus between the developmental onset criterion for the diagnosis. There has to be evidence that the disability manifests itself before the age of 18. He was 25 when he took the test. If it's valid, those are the best IQ data we've got in terms of confirming the presence of the disorder during the developmental period, in terms of the onset. But, again, I can't confirm that.

Unlike Dr. O'Brien, Dr. Macvaugh saw raw data as "paramount." "[T]here could be gross flaws in the scoring or in the administration of the test that make the scores completely useless," he explained. In addition to the lack of raw data, Dr. Kallman did not administer a malingering test.

¶53. For adaptive functioning, Dr. Macvaugh reviewed school and Mississippi Department of Corrections records and interviewed collateral sources. Contrary to Dr. O'Brien, he believed that Carr's thirty-fourth and thirty-sixth percentile scores in Math Computation and Spelling, respectively, were both inconsistent with intellectual disability. And even though Carr's grades consistently were failing or near failing, the fact that Carr reached eighth grade was significant:

> In my experience that is rare [for someone who is intellectually disabled to even be in the eighth grade]. Usually folks that have mild mental retardation achieve at about or up to the sixth grade level. They are often in special education; not always, for some of the reasons that Dr. O'Brien was asked about. My understanding and my experience, however, is that it is very uncommon for somebody who has mental retardation or intellectual disability, to make it to the eighth grade and obtain certain achievement test scores with national percentile rankings this high if they had mental retardation. Those factors together would be unlikely, in my opinion. Is it possible? Sure. Is it probable? Probably not.

Dr. Macvaugh also saw Hunt as a credible, reliable source.

¶54. Dr. Macvaugh was noncommittal as to whether Carr's nonplacement in special education showed that Carr was not intellectually disabled. On one hand, he believed it would be "very difficult" for someone who is intellectually disabled to make it to ninth grade without special education. Further, some of Carr's achievement-test scores raised doubts as to whether Carr would have been eligible for special education. At the same time, Dr.

Macvaugh said other factors could have kept Carr from being placed in special education. Schools sometimes refrain from identifying intellectual impairments because of social stigma, political pressures, economics, racial issues, and over-identification biases. Like Dr. O'Brien, Dr. Macvaugh did not attribute much weight to Carr's excessive absences. On one hand, he said it is hard to learn if you do not attend. But people with intellectual disabilities often miss school for that very reason: they are embarrassed about their underperformance.

¶55. In assessing adaptive deficits, Dr. Macvaugh could not form a definitive opinion. "In my opinion, the possible areas of adaptive deficits that we had concerns about . . . consisted of functional academics and employment history. Those were two that [Carr] could possibly have. But the data, again, were contradictory, inconsistent, and didn't fall squarely in one direction or the other."

¶56. Finally, Dr. Macvaugh was critical of Dr. O'Brien's methodology. Dr. Macvaugh said he would not have proceeded as Dr. O'Brien did—without testing or evaluating Carr, or personally interviewing collateral sources. "I don't think I have ever seen a forensic psychologist offer a definitive opinion, to a reasonable degree of psychological certainty, without personally evaluating the defendant, without personally collecting the data," Dr. Macvaugh said. He also believed that forensic and ethical guidelines require all data—both supportive and nonsupportive of the expert's opinion—to be included in a report.

> D. The circuit judge found that Carr had failed to prove significantly subaverage intellectual functioning.

22

¶57. After hearing all of the evidence detailed above, the circuit judge issued an order denying Carr's petition. After detailing the various IQ tests administered and the expert's testimony about the tests, the trial judge concluded

> It can be said comfortably that Carr's IQ, as demonstrated by the tests which were given, falls somewhere in the 70 to 75 range. Given the applicable and conceded margin [of] error of five (5) points either way which is applicable to such test[s], Carr's actual IQ could range anywhere from a low of 65 to a high of 80. Obviously the lower the IQ, the more mental retardation is suggested. The higher the IQ, the less mental retardation is suggested. This is the inherent flaw in attempting to come to a concrete conclusion regarding a particular subject when the means for doing so relies on a margin of error. Certainly, Carr's intelligence level is at the lower end of the spectrum, but is it *significantly* sub-average? Given the range within which the test results are found and the applicable margin of error, this court cannot find by a preponderance of the evidence that Carr has carried his burden of proof. **While this finding alone is sufficient to deny Carr's claim of mental retardation**, because of the significance of this decision, the court will consider the other two remaining factors.

(Emphasis added). The trial judge then went on to discuss the other two factors. And while he found that Carr had "demonstrated adaptive skill deficits in at least two (2) of the adaptive skill areas noted in the applicable definitions," he did not specify in which two areas he found those adaptive deficits, nor did he discuss the severity or extent of those deficits.[9]

> E.     The circuit judge used an erroneous legal standard.

---

[9]While the judge did not make a specific finding regarding the onset-before-eighteen prong in his initial order, he noted in his order denying Carr's motion for reconsideration that Carr said he had "overlooked" evidence indicating that Carr had manifested signs of intellectual disability before age eighteen. The judge said he "did not ignore [that] evidence." Rather, he "simply had a different take on such evidence as does defense counsel." In short, the trial judge found that Carr had failed to prove the onset-before-eighteen prong as well.

23

¶58.    The ultimate decision of whether an individual is intellectually disabled for purposes of the Eighth Amendment rests with the trial judge. *Doss v. State*, 19 So. 3d 690, 714 (Miss. 2009).  The trial judge "sits as the trier of fact and assesses the totality of the evidence as well as the credibility of witnesses." *Id.*  The burden of proof "is on the petitioner to show 'by a preponderance of the evidence' that he [or she] is entitled to relief." *Goodin*, 102 So. 3d at 1111 (quoting *Doss*, 19 So. 3d at 694); *see also* Miss. Code § 99-39-23(7) (Rev. 2015) ("No relief shall be granted under this article unless the petitioner proves by a preponderance of the evidence that he is entitled to the relief.").  And all three of the factors—significantly subaverage intellectual functioning, significant deficits in adaptive behavior, and manifestation before age eighteen—must be met before the petitioner can be classified as intellectually disabled and declared ineligible for execution under *Atkins*.  *Doss*, 19 So. 3d at 709.

¶59.    If the trial court denies relief, this Court will not disturb that court's factual findings unless they are clearly erroneous.  *Goodin v. State*, 102 So. 3d 1102, 1111 (Miss. 2012) (quoting *Doss*, 19 So. 3d at 694).  Factual findings are not clearly erroneous simply because this Court would have decided the case differently.  *Booker v. State*, 5 So. 3d 356, 358 n.2 (Miss. 2008) (quoting *Easley v. Cromartie*, 532 U.S. 234, 242, 121 S. Ct. 1452, 149 L. Ed. 2d 430 (2001)).  But this limitation upon our scope of review is enforced "*only where the factfinder applied the correct legal standard*." *McClendon v. State*, 539 So. 2d 1375, 1377 (Miss. 1989) (emphasis added).  On the other hand, *where . . . the trial judge has applied an erroneous legal standard, we should not hesitate to reverse*." *Id.* (emphasis added).  And

24

questions of law are reviewed de novo. *Goodin v. State*, 102 So. 3d 1102, 1111 (Miss. 2012) (citation omitted).

¶60.    As discussed above, the current medical literature establishes three criteria for courts to consider: (1) significantly subaverage intellectual functioning, (2) significant deficits in adaptive functioning, and (3) manifestation before age eighteen. *Chase v. State*, 873 So. 2d 1013, 1029 (Miss. 2004). With regard to the first criterion, this Court recognized that medical literature generally quantifies significantly subaverage intellectual functioning as two standard deviation below the mean full-scale IQ score, 70, but that "[a]ccording to the DSM-IV, 'it is possible to diagnose Mental Retardation in individuals with IQ's between 70 and 75 who exhibit significant deficits in adaptive behavior.'" *Id.* at 1028.

¶61.    But in *Hall v. Florida*, the United States Supreme Court made clear that states' discretion to establish criteria is not unlimited. *Hall*, 134 S. Ct. at 1998 ("But *Atkins* did not give the States unfettered discretion to define the full scope of the constitutional protection."). That Court held that "[t]he legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework." *Id.* at 2000. Relying on "the medical community's diagnostic framework," the Supreme Court further stated "[i]t is not sound to view a single factor as dispositive of a conjunctive and interrelated assessment." *Id.* at 2001.

¶62.    So according to the Supreme Court, the Florida statute at issue—which categorically excluded from its definition of intellectual disability all persons with an IQ above 70—failed constitutional scrutiny not only because it "fail[ed] to take into account the standard error of measurement, . . . but also [because it] bars an essential part of a sentencing court's inquiry

25

into adaptive functioning." *Id.* "[W]hen a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive functioning." *Id.* Thus, a legal standard that views a full-scale IQ score as dispositive of intellectual disability without performing and balancing an interrelated analysis of adaptive functioning, runs afoul of the Eighth Amendment.

¶63.    The prevailing medical literature—which this Court has adopted as Mississippi's legal standard—confirms this view.  The Diagnostic and Statistical Manual, Fifth Edition, states that:

> IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks.  For example, a person with an IQ score above 70 may have such *severe* adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score.  Thus, clinical judgment is needed in interpreting the results of IQ tests.

DMS-V at 37 (emphasis added).  So subaverage intellectual functioning (the first criterion) must be considered conjunctively with—and balanced with—adaptive functioning (the second criterion).  Specifically, when the petitioner's full-scale IQ falls within the possible range for intellectual disability, the factfinder must consider whether the petitioner exhibits such severe deficits in adaptive functioning to support adjudication as intellectually disabled.

¶64.    Here, the circuit judge held:  "It can be said comfortably that Carr's IQ, as demonstrated by the tests which were given, falls somewhere in the 70-75 range." But—despite Carr's full-scale IQ between 70 and 75—the circuit judge failed to consider intellectual and adaptive functioning as an interrelated analysis.  Instead, he found that Carr

26

failed to prove subaverage intellectual functioning, and that this failure alone disposed of the case. He stated: "[T]his court cannot find by a preponderance of the evidence that Carr has carried his burden of proof" to show significantly sub-average intellectual functioning. "[T]his finding alone is sufficient to deny Carr's claim of mental retardation." This finding was clearly erroneous as a matter of law.

¶65. Then, based on the "significance of [his] decision," the circuit judge stated he would proceed to consider the two remaining criteria. But despite finding that Carr had proven the existence of two adaptive functioning deficits, the circuit judge did not identify those deficits, make any findings regarding their severity, or consider them as part of an interrelated analysis with Carr's intellectual functioning. Because "the medical community's diagnostic framework" recognizes that Carr's IQ between 70 and 75, coupled with "severe adaptive behavior problems" could support a diagnosis of intellectual disability, the circuit judge applied an incorrect legal standard by treating Carr's IQ score alone as dispositive of this case, and by failing to balance and analyze his adaptive functioning deficits with his IQ score. We therefore reverse the trial court judgment and remand this case to provide the circuit judge an opportunity to consider whether Carr's adaptive functioning deficits—which the circuit judge found to exist—are so severe that Carr should be ruled intellectually disabled through an interrelated analysis with his IQ scores, which the circuit judge found to be between 70 and 75.[10]

---

[10]Carr also must establish manifestation before age eighteen. Because the circuit judge found that adaptive functioning deficits existed based on evidence which largely focused on Carr's academic performance before age eighteen, we instruct the trial court to review its findings on this prong upon remand.

27

¶66.    For the foregoing reasons, we reverse the circuit judge's ruling and remand this case for new factual findings applying the correct legal standard.  We therefore reverse the judgment of the Quitman County Circuit Court and remand this case for proceedings consistent with this opinion.

¶67.    **REVERSED AND REMANDED.**

**WALLER, C.J., DICKINSON, P.J., COLEMAN AND BEAM, JJ., CONCUR. MAXWELL, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY COLEMAN, J.; RANDOLPH, P.J., JOINS IN PART. RANDOLPH, P.J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION.  KING, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, J.**

**MAXWELL, JUSTICE, SPECIALLY CONCURRING:**

¶68.    This case presents a battle of experts and under a typical common-sense approach to expert testimony should be affirmed.  The judge weighed both side's experts, and after doing so, concluded Carr failed in his burden of proof.  While this is generally how our courts handle expert testimony, the majority finds the trial judge erred in this process, essentially for thinking like a jurist, not a doctor.

¶69.    The majority reverses the judge's decision because he utilized a general legal framework and did not follow "the medical community's diagnostic framework."  Though this reasoning is counterintuitive to how our trial courts operate, it is the exact method dictated by the United States Supreme Court's holding in *Hall*.[11]  So I am constrained to find

---

[11] ***Hall v. Florida***, 134 S. Ct. 1986, 1998, 188 L. Ed. 2d 1007 (2014).

the majority correctly applies **Hall** when it finds the trial judge reversibly erred by "failing to balance and analyze his adaptive functioning deficits with his IQ score."

¶70.    But I write separately because this case is a prime example of the confusion created by **Atkins**[12] and compounded by **Hall**.  Undoubtedly, whether someone is ineligible for the death penalty due to intellectual disability is a *legal* question.  Yet it is a legal question the United States Supreme Court has said must be largely informed by the *medical* community.[13] And therein lies the problem.

¶71.    Medicine—and specifically the field of psychology—is a completely different discipline than the law.  Indeed, psychology openly embraces ever-evolving definitions[14]—a stark contrast to our common law's doctrine of stare decisis. The trial judge in this case certainly felt this tension.  In his final order, he lamented "the difficulty when attempting to make a concrete decision when the factors upon which the decision must be based are grounded in the soft sciences."

¶72.    This begs the question—Why are we asking our trial judges to wade into the soft sciences and make *medical* diagnoses?  We do not do that in other legal contexts.  According to the majority, the trial judge here failed to "recognize[] that Carr's IQ between 70 and 75,

---

[12] **Atkins v. Virginia**, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

[13] **Hall**, 134 S. Ct. at 1993.

[14] *See **id.*** at 2004 (Alito, J., dissenting) (pointing out that, "because the views of professional associations often change, tying Eighth Amendment law to these views will lead to instability and continue to fuel protracted litigation," especially when factoring in "that changes adopted by professional associations are sometimes rescinded"). *See also* **Chase v. State**, 171 So. 3d 463, 470 (Miss. 2015) ("This Court is faced with the reality of evolving standards for determining intellectual disability in the medical community.").

29

coupled with 'severe adaptive behavior problems' could support a *diagnosis* of intellectual disability." But our trial judges are not licensed forensic psychologists. Instead, their role as a neutral and detached magistrate necessarily depends on licensed forensic psychologists to give *their* expert diagnoses. This is the very reason why this Court requires every ***Atkins*** claimant to produce at least one licensed forensic psychologist willing to testify to a reasonable degree of certainty that the claimant meets the adopted clinical definitions of intellectually disabled.[15]

¶73. Here, the judge was presented with two expert opinions. Carr's expert, Dr. Gerald O'Brien, testified Carr was intellectually disabled. But O'Brien refused to specify how he reached his conclusions. Further, he admitted he was not personally involved in the investigative process. The State's expert, Dr. Gilbert Macvaugh, by contrast, testified he could not reach a reasonable degree of certainty whether Carr was or was not intellectually disabled, based on the lack of data. Moreover, the one lay witness was "unhelpful"—neither leading credence or doubt to either expert's view. The trial judge ultimately found the State's expert was more credible, agreeing the question of Carr's intellectual disability was "too close to call." The judge then considered this evidentiary finding in light of the applicable legal standard. And he held Carr to his legally required burden of proof. This type of analysis should be legally sufficient, since it is the exactly how judges size up expert testimony in other contexts. But it is not under ***Atkins*** and ***Hall***.

¶74. Logic dictates we should allow our judges to function like trial judges and to *weigh the evidence*—particularly, the credibility of the expert witnesses and *their* diagnoses—to

---

[15] ***Chase v. State***, 873 So. 2d 1013, 1029 (Miss. 2003).

make a finding whether the claimant met his or her burden of proof to show intellectual disability. It makes no sense to demand our trial judges pretend they are psychologists and to delve into the three criteria that comprise the clinical definition of intellectual disability to make an *independent* diagnosis. But unless and until the United States Supreme Court untethers its Eighth Amendment jurisprudence from the ever-changing clinical definition of intellectual disability, this is the exact approach our trial judges must utilize. Until then, our judges apparently will have to don the hats of psychologists and apply the proper "diagnostic framework."[16]

**COLEMAN, J., JOINS THIS OPINION. RANDOLPH, P.J., JOINS THIS OPINION IN PART.**

**KING, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶75. Because I disagree with the manner in which the majority reframed the issues on appeal and with the majority's failure to address the issue of Carr's elementary school teacher's opinion, I write separately. I agree, however, with the majority's assessment that the trial court erred in finding IQ alone determinative and with the decision to reverse and remand the case.

*1. The Standard of Review Argument*

¶76. The majority "restated" the issue on appeal as "Is it unconstitutional for Carr to bear the burden of proof here, when the trial judge found that the question of his intellectual disability was 'too close to call'?" Yet, the exact issue raised by Carr was "Will the circuit court's holding that the outcome of the *Atkins* hearing was a tie and that, because of the

---

[16] *Hall*, 134 S. Ct. at 2000.

31

burden of proof, the State must prevail, result in an unacceptable risk of executing a person with mental retardation in violation of **Atkins v. Virginia** and **Chase v. State**?" While the distinction is subtle, Carr argued that the facts of his particular case create an unacceptable risk of executing a person with an intellectual disability.[17] The majority's phrasing broadens that to a more general question of whether it is unconstitutional for Carr to bear the burden of proof in a close case. The majority has unnecessarily "restated" the issue appealed, and with this I take umbrage. Moreover, it is unnecessary for the majority to address this issue, given that it found the trial court erred in finding IQ determinative, and it reverses and remands because this issue is dispositive.

### 2. Reliance on Teacher's Opinion

¶77.    The trial court erred in relying on a teacher's opinion documented within the State's report to *directly counter* expert testimony. In other words, the teacher did not testify at the hearing and certainly was not qualified as an expert. The State argues that the teacher's statements were admissible, but that argument misses the point. Carr does not argue that the teacher's statements were inadmissible; rather, he argues that the manner in which the circuit court relied upon those statements was error, as the trial court appeared to improperly give the teacher's opinion the weight of an expert opinion.

¶78.    The trial court stated in its order:

> *Contrary to O'Brien's opinion*, Carr's sixth grade teacher opined that
> Carr did not suffer from mental retardation during his earlier years but rather

---

[17]I note that this hearing was held when the medical term for what is now termed "intellectual disability" was "mental retardation." Thus, to the extent I refer to the hearing or how witnesses at the hearing opined, I may use the terminology used at that time. Otherwise, I will use the term "intellectual disability."

32

suffered from a learning disability. . . . She indicated that special education was available during that time period but that Carr was not placed into special education. It was apparent that O'Brien did not put great stock in the opinions of this former teacher. On the other hand, Macvaugh appears to have put more reliance upon the teacher's opinion. Macvaugh suggested that because mental retardation is primarily an impediment to learning, it more often than not is first demonstrated in the area of academics. As such, teachers are often the first to note the signs of mental retardation. As to the ultimate issue of whether Carr demonstrated signs of mental retardation prior to the age of 18, Macvaugh again found the issue "too close to call."

(Emphasis added.) The trial court ultimately concluded that "Some thirty years after grade school, the defense expert reviews Carr's academic record and finds mental retardation, while the individual who actually taught Carr, someone who saw him day after day when Carr was in school and who has no interest in this matter at all, is of the view that Carr was not mentally retarded, but rather suffered from a learning disability."

¶79. In both provisions of the order mentioning Carr's teacher, the trial court uses her opinion to directly counter the expert opinion of Dr. O'Brien. Perhaps this was done because Dr. Macvaugh's expert opinion was *not* in direct opposition to Dr. O'Brien's. Dr. O'Brien found that Carr was mentally retarded, while Dr. Macvaugh found the issue of Carr's mental retardation too close to call. The teacher was the only person of the definitive opinion that Carr was *not* mentally retarded. Yet, the telephone interview of a teacher by the State on September 15, 2009, for a hearing that occurred on February 6, 2013, in no way constitutes an expert opinion.

¶80. Mississippi Rule of Evidence 701 provides that lay opinion testimony is limited to an opinion that is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on

33

scientific, technical, or other specialized knowledge within the scope of Rule 702." Miss.

R. Evid. 701. Rule 702 provides that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Miss. R. Evid. 702. The determination of whether Carr is intellectually disabled is clearly one that requires specialized knowledge. Carr's teacher was never qualified as an expert with such knowledge. While certainly the State's report containing her interview was admissible evidence, relying on her lay opinion that Carr was not mentally retarded, especially to directly contradict the opinion of the defense expert, was improper. Because the trial court improperly treated the teacher's opinion as expert opinion, I believe this also warrants reversing and remanding this case for a new *Atkins* hearing in which the trial court should be more cognizant as to its reliance on such evidence.

¶81. For these reasons, I concur with the majority's conclusion that the trial court erred in finding IQ dispositive, and with its assessment that IQ must be examined in conjunction with adaptive functioning to determine whether intellectual disability exists, and I consequently agree with the decision to reverse the judgment and remand this case. However, I disagree with the majority's decision to address the burden of proof argument, an argument that it

34

problematically "restated." I also believe that we should address the issue of the trial court's improper use of the teacher's opinion, and admonish the court not to rely on the opinion of the teacher as if it was an expert opinion.

**KITCHENS, J., JOINS THIS OPINION.**