MAXWELL, JUSTICE, FOR THE COURT:
 

 ¶ 1. A jury sentenced Willie C. Russell to death for murdering a correctional officer. Russell later claimed he was intellectually disabled and thus could not be executed under
 
 Atkins v. Virginia
 
 .
 
 [1]
 
 In 2014, the trial court set an
 
 Atkins
 
 hearing to determine if Russell was intellectually disabled.
 

 ¶ 2. Prior to the hearing, the State moved to assess Russell based on his claimed intellectual disability. But Russell was opposed to the State's expert conducting an
 
 Atkins
 
 evaluation. Years earlier, in 2006, Russell had undergone psychological testing ordered in a separate aggravated-assault case. But that testing was for his competency to stand trial-not assessing intellectual disability. Although the State had initially proposed that the 2006 assessment cover both issues, Russell's attorney also objected back then to the State evaluating Russell's
 
 Atkins
 
 claim in that proceeding. So Russell was never evaluated on the specific criteria for intellectual disability under
 
 Atkins
 
 .
 

 ¶ 3. Furthermore, the record shows both Russell and the State understood that the 2006 testing
 
 would not
 
 serve as his complete
 
 Atkins
 
 assessment. And, indeed, according to the State's expert, additional testing was required. Still, the trial court denied the State's motion to evaluate Russell, concluding the prior testing was sufficient. Consequently, the court's denial led to what was essentially a one-sided
 
 Atkins
 
 hearing.
 

 ¶ 4. At the end of the hearing-at which Russell's expert testified-the trial court ruled that Russell was intellectually disabled under
 
 Atkins
 
 and
 
 Chase
 

 [2]
 
 and vacated his death sentence. The State has appealed. After review, we find the trial court reversibly erred. While
 
 Atkins
 
 determinations are legal decisions, they are decisions that must be informed by medical experts.
 
 [3]
 
 And here, we find the trial judge abused her discretion by denying the State's well-supported motion to evaluate Russell prior to the
 
 Atkins
 
 hearing.
 

 ¶ 5. We reverse the order vacating Russell's death sentence. And we remand this matter to the trial court with instructions that the State's expert be permitted to evaluate Russell before the
 
 Atkins
 
 hearing.
 

 Background Facts and Procedural History
 

 I. Capital-Murder Conviction and Death Sentence
 

 ¶ 6. In 1989, while an inmate at the State Penitentiary at Parchman, Russell stabbed and killed a corrections officer. A jury convicted Russell of capital murder and
 sentenced him to death. On appeal, this Court affirmed his conviction but vacated his death sentence and remanded for resentencing.
 
 Russell v. State
 
 ,
 
 607 So.2d 1107
 
 (Miss. 1992) (
 
 Russell I
 
 ). On remand, Russell once again was sentenced to death. And this Court affirmed.
 
 Russell v. State
 
 ,
 
 670 So.2d 816
 
 (Miss. 1995) (
 
 Russell II
 
 ).
 

 ¶ 7. Russell filed for post-conviction relief (PCR). In 2002, while his petition was still pending, the United States Supreme Court handed down
 
 Atkins
 
 , holding that, based on "evolving standards of decency," imposing the death penalty on intellectually disabled persons violates the Eighth Amendment.
 
 Atkins
 
 , 536 U.S. at 321, 122 S.Ct. at 2252. This Court granted Russell permission to amend his PCR petition to include the claim that he is intellectually disabled and thus, under
 
 Atkins
 
 , cannot be executed. This Court granted Russell's PCR petition in part, granting him leave to proceed in the trial court with his
 
 Atkins
 
 claim.
 
 Russell v. State
 
 ,
 
 849 So.2d 95
 
 , 149 (Miss. 2003) (
 
 Russell IV
 
 ).
 

 II. Aggravated-Assault Charge
 

 ¶ 8. At the time his
 
 Atkins
 
 petition was granted, Russell was facing a separate charge of aggravated assault. While on death row, Russell had shot at another corrections officer with a homemade "zip gun." As part of his defense to this charge, Russell asserted that he was incompetent to voluntarily confess and stand trial. He also claimed he was insane at the time he shot at the corrections officer.
 

 ¶ 9. Because of the pending
 
 Atkins
 
 issue, Russell asked that his aggravated-assault trial be stayed. But by 2006, three years had passed without Russell pursuing his
 
 Atkins
 
 claim. At this point, a different trial judge presiding over the assault case refused to let that charge linger on the docket any longer. The assault trial would move forward, with or without the
 
 Atkins
 
 issue being resolved.
 

 ¶ 10. The State initially suggested evaluating both Russell's
 
 Atkins
 
 claim and his mental-health-related defenses in the aggravated-assault case at the same time. And the original evaluation order included a directive to assess Russell's
 
 Atkins
 
 claim. But Russell opposed proceeding in this manner. Instead, he argued that the judge who was presiding over his aggravated-assault trial-a different judge than the one handling the
 
 Atkins
 
 claim-had no authority over the
 
 Atkins
 
 claim raised in his separate capital-murder case. The trial court succumbed to his request and struck that portion of its order.
 

 ¶ 11. As a result, the State Hospital did not assess whether Russell had an intellectual disability preventing the State from executing him. Page one of the 2006 case report notes the order to evaluate Russell's
 
 Atkins
 
 claim was vacated. And in the transcript of Russell's 2006 clinical interview, his counsel agreed "[t]his isn't going to be a complete
 
 Atkins
 
 assessment."
 

 ¶ 12. Russell did, however, participate in a clinical interview by Dr. Reb McMichael, Dr. Gilbert Macvaugh III, and Dr. Criss Lott. And he underwent three psychological tests-the Wechsler Adult Intelligence Scale-3rd Edition (WAIS-III), the Wide Range Achievement Test, 4th Edition (WRAT-4), and the Green's Word Memory Test (WMT). Dr. McMichael also reviewed extensive records to compile the 2006 State Hospital's report. Dr. McMichael testified during the aggravated-assault trial that Russell was competent to confess voluntarily and to stand trial and was not insane at the time he shot at the corrections officer. Dr. McMichael also offered his unsolicited opinion that Russell was not intellectually disabled, based on the 2006 evaluation.
 

 III. Motion to Evaluate
 

 ¶ 13. In 2010, Russell finally filed his
 
 Atkins
 
 petition with the trial court. After reviewing the State Hospital records from Russell's 2006 assessment, which clearly indicated Russell's
 
 Atkins
 
 assessment had yet to occur, the State moved to evaluate Russell on his
 
 Atkins
 
 claim. Russell objected. Russell's counsel represented to the trial judge-again, a different judge than the one presiding over the aggravated-assault charge-that Russell only agreed to be evaluated in 2006 with the express understanding he would not be tested any further.
 

 ¶ 14. The trial court held a hearing, during which the State called Dr. Macvaugh, its designated
 
 Atkins
 
 expert.
 
 [4]
 
 Dr. Macvaugh, a participant in the 2006 evaluation, testified that he recalled cautioning Russell and Russell's counsel that any data collected in the aggravated-assault evaluation
 
 could
 
 be used in a future
 
 Atkins
 
 assessment. But there was never any agreement Russell would not be further tested. Indeed, in the transcript from the 2006 clinical interview, Russell's counsel had conceded the evaluation would not be a full
 
 Atkins
 
 assessment and objected only to Russell "being given the same test batteries twice in the course of the next year or anything like that."
 

 ¶ 15. Dr. Macvaugh further testified that "additional intellectual assessment is needed, additional adaptive assessment is needed, and additional malingering assessment is needed, ... in order to offer an opinion to a reasonable degree of psychological certainty as to whether or not Mr. Russell has mental retardation pursuant to
 
 Atkins
 
 ." Specifically, Dr. Macvaugh wanted to administer the most up-to-date Wechsler Adult Intelligence Scale-the WAIS IV-because it incorporates significant developments in the field since the WAIS III. Dr. Macvaugh also planned to test Russell for adaptive-functioning deficits-something he and his colleagues did not assess in 2006. But beyond that, he explained he was ethically and professionally bound not to go into more specifics about what tests he might administer. In particular, divulging beforehand to Russell's counsel what tests were to be administered could affect the validity of the test results. It could also box Dr. Macvaugh in to administering certain instruments, even though he might later determine, in his professional opinion, other tests would be better.
 

 ¶ 16. On cross-examination, Dr. Macvaugh was pressed as to why, in contrast to Dr. McMichael, he could not simply rely on the 2006 data to form an expert opinion. Dr. Macvaugh responded that he disagreed with Dr. McMichael that the prior testing was sufficient to form an opinion on intellectual disability when that issue is raised in a death-penalty case. He further explained "[i]t doesn't make clinical, forensic, or ethical sense to me to not want more, better data when the stakes are as high as they are."
 

 ¶ 17. Though the trial court's order acknowledged Russell had agreed that the 2006 evaluation would not be a complete
 
 Atkins
 
 assessment, the judge nonetheless decided no further testing was needed to form an expert
 
 Atkins
 
 opinion. In particular, the trial court was swayed by Dr. McMichael's opinion given in the non-death-penalty case and the fact Dr. Macvaugh would not divulge specifically what tests he planned to administer. The trial court treated the State's motion as one for a "subsequent exam." And the court ruled the State had not shown good cause to
 administer any further tests. Instead, "[t]o permit the State's expert to examine Mr. Russell a second time would be to permit an unfair and unwarranted forensic advantage."
 

 IV.
 
 Atkins
 
 Hearing
 

 ¶ 18. The trial court heard Russell's
 
 Atkins
 
 petition on September 8-9 and December 17, 2014. Russell presented three witness. First, he called Clementine Harrison, a volunteer investigator with the Louisiana Capital Assistance Center (LCAC) in 2007. Harrison testified she had investigated Russell's
 
 Atkins
 
 claim, collecting Russell's school records and witness statements.
 
 [5]
 
 Next, Russell called Anne Preziosi, a mitigation specialist with LCAC, to testify as an expert. But due to her lack of qualifications, she could only testify as a lay witness about the records and witness statements she collected. Finally, Russell's expert, clinical psychologist and neuropsychologist Dr. John Goff, testified. Dr. Goff concluded that Russell is intellectually disabled, based on Russell's prior IQ scores, his adaptive-functioning deficits, and his placement in special-education classes, indicating onset prior to age eighteen. Dr. Goff also opined Russell was not malingering.
 
 See
 

 Chase
 
 , 873 So.2d at 1027-28 (setting forth the criteria for determining whether a criminal defendant is intellectually disabled for Eighth Amendment purposes).
 

 ¶ 19. When Russell rested, the State announced it would not present any witnesses.
 
 [6]
 
 On December 31, 2014, the trial court entered an order vacating Russell's death sentence. And the State appealed.
 

 Discussion
 

 ¶ 20. While the State raised three issues on appeal, we need focus on only one-the trial court's denial of its motion to evaluate Russell on his
 
 Atkins
 
 claim.
 
 [7]
 

 ¶ 21. The State suggests this issue raises a purely legal question, requiring de novo review. But we review discovery matters, even in death-penalty PCRs, for abuse of discretion.
 
 E.g.,
 

 Brown v. State
 
 ,
 
 88 So.3d 726
 
 , 730 (Miss. 2012). That said, in this case, we find the trial court abused its discretion when it ruled the State had "adequate opportunity" and information to evaluate Russell's
 
 Atkins
 
 claim, because that ruling is not supported by the record.
 

 ¶ 22. Instead, the record is clear that the State Hospital
 
 did not
 
 assess in 2006 whether Russell had an intellectual disability preventing the State from executing him. The first page of the 2006 case report notes the order to evaluate Russell's
 
 Atkins
 
 claim was vacated. And in the transcript of Russell's 2006 clinical interview, Russell's counsel agreed "[t]his isn't going to be a complete
 
 Atkins
 
 assessment." Dr. Macvaugh, who participated in the 2006 assessment, confirmed this, testifying unequivocally that the State doctors were not ordered to and did not evaluate Russell's claim that he was intellectually disabled.
 

 ¶ 23. Thus, contrary to the trial court's characterization, when the State moved in
 2012 to evaluate Russell on his
 
 Atkins
 
 claim, it was not seeking a second, duplicate
 
 Atkins
 
 evaluation. It was requesting
 

 the
 
 Atkins
 
 evaluation.
 
 [8]
 
 The State made this request not to redo what had already been done or, as the trial court put it, to gain a "forensic advantage." Instead, it made this request at the behest of its expert. According to Dr. Macvaugh-no stranger to
 
 Atkins
 
 and its requirements
 
 [9]
 
 -additional intellectual, adaptive, and malingering assessments were necessary "in order to offer an opinion to a reasonable degree of psychological certainty as to whether or not Mr. Russell has mental retardation pursuant to
 
 Atkins
 
 ."
 

 ¶ 24. Despite this, the trial court ruled that Dr. Macvaugh had performed all the necessary testing to form an expert opinion, even though he testified that, in his
 
 professional
 
 opinion, more data was required. In other words, it was the trial judge-not the expert-who opined that no further assessment was necessary. As support, the trial court relied on the testimony given by Dr. Reb McMichael in Russell's aggravated-assault case that Russell was not intellectually disabled, based on the 2006 evaluations. But the only impact of this opinion was that it contributed to the trial court finding Russell was competent to stand trial on the assault charge. Significantly, Dr. McMichael's opinion had no bearing on whether Russell could be put to death. When the stakes were raised and the life-and-death question of Russell's intellectual ability to suffer execution was posed to Dr. Macvaugh, Dr. Macvaugh testified the 2006 evaluations
 
 were not
 
 sufficient to form an opinion to a reasonable degree of psychological certainty.
 

 ¶ 25. When questioned by Russell's counsel on why he could not just use the 2006 data, as Dr. McMichael did in the assault case, Dr. Macvaugh replied, "It doesn't make clinical, forensic, or ethical sense to me to not want more, better data when the stakes are as high as they are." In other words, according to an
 
 Atkins
 
 expert, forming an expert opinion on intellectual disability is a much weightier task in the
 
 Atkins
 
 context, requiring more specific and better data.
 

 ¶ 26. While
 
 Atkins
 
 determinations are legal decisions, they are decisions that, according to the United States Supreme Court, must be informed by medical experts.
 
 [10]
 

 Hall
 
 , 134 S.Ct. at 2000,
 
 188 L.Ed.2d 1007
 
 (acknowledging
 
 Atkins
 
 decisions require "substantial reliance on the expertise of the medical profession"). Here, instead of being informed by the medical expert on what assessments are necessary, it was the trial judge who informed the expert what assessments were sufficient. This was an abuse of discretion.
 

 In reaching this conclusion, the trial court not only improperly stepped into the role of a forensic psychologist, but it also broke with this Court's precedent recognizing that the medical expert is in the best position to determine what testing is sufficient to form an opinion on the petitioner's intellectual disability.
 
 See, e.g.,
 

 Lynch v. State
 
 ,
 
 951 So.2d 549
 
 , 556-57 (Miss. 2007) (abolishing this Court's prior mandatory requirement that the experts administer a specific test for malingering);
 
 see also
 

 State v. Scott
 
 , 2014-KA-00123-SCT,
 
 233 So.3d 253
 
 , 261,
 
 2017 WL 2377563
 
 , at *6 (Miss. June 1, 2017) (clarifying that the expert must be given the freedom to chose the method he or she deems appropriate, in his or her expert view, to make an
 
 Atkins
 
 assessment).
 

 ¶ 27. In doing so, the trial judge placed the State in an impossible position. Dr. Macvaugh was adamant that, professionally and ethically, he could not form an opinion on Russell's
 
 Atkins
 
 claim without further assessment. But the trial court ruled no further assessment could take place. Instead, the State would have to rely on data its own expert deemed insufficient to support a critical determination as to whether Russell could be put to death. Thus, the State was placed in a position where it was unable to test, and possibly attempt to disprove through expert testimony, Russell's claim he could not be executed. Even Russell's counsel recognized this bind, essentially predicting the State would not call an expert in defense because Dr. Macvaugh had been so adamant that the 2006 evaluation was insufficient to form an expert opinion to a degree of reasonable psychological certainty on the Russell
 
 Atkins
 
 claim.
 
 [11]
 
 Because our
 
 Atkins
 
 procedures clearly contemplate the State responding to the petitioner's evidence with its own expert opinion,
 
 [12]
 
 the trial court abused its discretion when it restricted the State in this way.
 

 Conclusion
 

 ¶ 28. We reverse the order vacating Russell's death sentence and remand this matter to the trial court, with instructions that the State's expert be permitted to evaluate Russell prior to the
 
 Atkins
 
 hearing.
 

 ¶ 29.
 
 REVERSED AND REMANDED.
 

 RANDOLPH, P.J., BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. WALLER, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J., KING AND COLEMAN, JJ.
 

 Atkins v. Virginia
 
 ,
 
 536 U.S. 304
 
 ,
 
 122 S.Ct. 2242
 
 ,
 
 153 L.Ed.2d 335
 
 (2002).
 

 Chase v. State
 
 ,
 
 873 So.2d 1013
 
 , 1027-28 (Miss. 2004).
 

 Hall v. Florida
 
 , --- U.S. ----,
 
 134 S.Ct. 1986
 
 , 2000,
 
 188 L.Ed.2d 1007
 
 (2014).
 

 Since the 2006 evaluation of Russell for the aggravated-assault case, Dr. Macvaugh had left his employment at the State Hospital and gone into private practice.
 

 The twenty witness statements she gathered were admitted into evidence over the State's objection.
 

 At a prior hearing on the State's motion to continue the
 
 Atkins
 
 hearing to a date when its expert, Dr. Macvaugh, was available, Russell's counsel had suggested there was no need for Dr. Macvaugh to testify any further, having already been clear that he lacked sufficient data to form an opinion to a reasonable degree of psychological certainty whether Russell was intellectually disabled under
 
 Atkins
 
 .
 

 The State also challenged the trial court's finding that Russell had proved by a preponderance of the evidence that he is intellectually disabled under
 
 Atkins
 
 and
 
 Chase
 
 and asserted "cumulative error" warranted reversal.
 

 Again, Russell only objected in 2006 to "being given the same test batteries twice in the course of the next year or anything like that"-something not at issue here, as the State filed its request to evaluate Russell
 
 six years later
 
 .
 

 In addition to performing numerous
 
 Atkins
 
 evaluations and testifying as an expert in many
 
 Atkins
 
 hearings, Dr. Macvaugh was asked by the American Association for Intellectual and Developmental Disability (AAIDD), a leading advocacy group for the intellectually disabled, to contribute to its "death penalty manual." Dr. Macvaugh wrote two chapters for the manual, which serves as a guide to forensic psychologists assessing intellectual disability in the context of
 
 Atkins
 
 . This Court has adopted the AAIDD's definition of intellectual disability for purposes of
 
 Atkins
 
 determinations.
 
 See
 

 Chase v. State
 
 ,
 
 171 So.3d 463
 
 , 469-70 (Miss. 2015).
 

 Indeed, in Mississippi, a petitioner cannot move forward with his
 
 Atkins
 
 claim unless he has produced expert testimony by a qualified licensed psychologist or psychiatrist that he meets the clinical definition of intellectually disabled.
 
 Chase
 
 ,
 
 873 So.2d at 1029
 
 .
 

 See
 
 n.6,
 
 supra.
 

 See
 

 Chase
 
 ,
 
 873 So.2d at 1029
 
 .