# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-CA-01481-SCT

*ANTHONY CARR*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 09/25/2017 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| COURT FROM WHICH APPEALED: | QUITMAN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF CAPITAL POST-CONVICTION |
| | BY: ALEXANDER KASSOFF |
| | JAMILA ALEXANDER |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JASON L. DAVIS |
| | LADONNA C. HOLLAND |
| NATURE OF THE CASE: | CIVIL-POST-CONVICTION RELIEF |
| DISPOSITION: | AFFIRMED - 06/06/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.    The United States Supreme Court has held that the Eighth Amendment to the United States Constitution prohibits the execution of intellectually disabled persons. On September 20, 2017, the Circuit Court of Quitman County denied Anthony Carr's petition for post-conviction relief ("PCR"), finding that Carr did not prove that he was intellectually disabled. Carr appealed the trial court's decision. We affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Anthony Carr was convicted of four counts of capital murder and sentenced to death for each. *Carr v. State*, 655 So. 2d 824, 830 (Miss. 1995) ("*Carr I* ").[1] In *Carr I*, we affirmed Carr's conviction. *Id.* at 858.

¶3. In 2004, we granted Carr leave to proceed in the circuit court on his PCR claim that he is intellectually disabled and, thus, ineligible for the death penalty under *Atkins v. Virginia*.[2] *Carr v. State*, 873 So. 2d 991 (Miss. 2004) ("*Carr II* "). The trial court later denied Carr's petition for PCR (the "original order"), and Carr appealed. *Carr v. State*, 196 So. 3d 926 (Miss. 2016) ("*Carr III*").

¶4. In *Carr III*, we reversed and remanded with directions for the trial court to make "new factual findings applying the correct legal standard." *Id.* at 944. Following the *Carr III* decision, the trial court entered a revised order, again denying Carr's petition for PCR (the "revised order"). The trial court entered the revised order more than a year after remand. In the interim, the trial court did not hold an additional hearing, and the parties did not request one. Carr timely appealed.[3]

---

[1] The facts surrounding Carr's underlying offense have been discussed at length previously by the Court and do not pertain to the issues on appeal.

[2] *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

[3] Carr also filed a motion for reconsideration. Although it does not appear that the motion for reconsideration was ever ruled on, we conclude that the instant appeal is proper. Under Rule 6(b) of the Mississippi Rules of Civil Procedure, the time period to file motions under Rule 52(b) cannot be extended. Miss. R. Civ. P. 6(b), 52(b). Thus, Carr's motion for reconsideration was untimely filed, and, with no arguments made by either party on appeal about it, we conclude that the motion for reconsideration has been abandoned.

## STATEMENT OF ISSUES

¶5. On appeal, Carr raises three issues. The State raises four issues. For the sake of clarity, we restate the issues as follows:

> I. Whether the trial court erred by failing to hold a new evidentiary hearing.
>
> II. Whether the trial court erred in holding that Carr did not prove by a preponderance of the evidence that he suffers from an intellectual disability that manifested prior to age eighteen.

## STANDARD OF REVIEW

¶6. The standard of review in the instant appeal is mixed. "[W]here questions of law are raised the applicable standard of review is *de novo*." ***Brown v. State***, 731 So. 2d 595, 598 (Miss. 1998) (citing ***Bank of Miss. v. S. Mem'l Park, Inc.***, 677 So. 2d 186, 191 (Miss. 1996)). When addressing whether the trial court and the Court in ***Carr III*** applied the correct legal standard, a *de novo* standard is applied. On the other hand, the Court "will not reverse the factual findings of the trial court unless they are clearly erroneous." ***Walker v. State***, 230 So. 3d 703, 704 (Miss. 2017) (citing ***Brown v. State***, 731 So. 2d 595, 598 (Miss. 1999).

## ANALYSIS

**I.** **Whether the trial court erred by failing to hold a new evidentiary hearing.**

¶7. Carr argues that the trial court erred by failing to hold a new evidentiary hearing. In support of his arguments, Carr presents evidence gathered from a new investigation that he would like to present in a new evidentiary hearing, including expert evidence from Dr. William Kallman. Carr maintains that the new evidence does not constitute new arguments.

3

Carr argues that the United States Supreme Court's decision in **Moore v. Texas**, 137 S. Ct. 1039, 197 L. Ed. 2d 416 (2017) ("**Moore I**"), and the Court's decision in **State v. Russell**, 238 So. 3d 1105 (Miss. 2017), have "wrought significant changes to **Atkins** jurisprudence," that "[t]he 2013 hearing was conducted under a different regime" and that Carr is therefore entitled to a new hearing.

¶8.     In response, the State argues that Carr waived the issue by not raising it in the trial court.  The State asserts that Carr's argument is an attempt to relitigate the entirety of his intellectual-disability claim.  Further, the State argues that Carr is procedurally limited to the issues that were the subject of **Carr III**'s remand.

¶9.     Mississippi Code Section 99-39-21 addresses waiver in PCR proceedings.  It reads,

> (1) Failure by a prisoner to raise objections, defenses, claims, questions, issues or errors either in fact or law which were capable of determination at trial and/or on direct appeal, regardless of whether such are based on the laws and the Constitution of the state of Mississippi or of the United States, shall constitute a waiver thereof and shall be procedurally barred, but the court may upon a showing of cause and actual prejudice grant relief from the waiver.

> (2) The litigation of a factual issue at trial and on direct appeal of a specific state or federal legal theory or theories shall constitute a waiver of all other state or federal legal theories which could have been raised under said factual issue; and any relief sought under this article upon said facts but upon different state or federal legal theories shall be procedurally barred absent a showing of cause and actual prejudice.

> (3) The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal.

> (4) The term "cause" as used in this section shall be defined and limited to those cases where the legal foundation upon which the claim for relief is based could not have been discovered with reasonable diligence at the time of trial or direct appeal.

4

(5) The term "actual prejudice" as used in this section shall be defined and limited to those errors which would have actually adversely affected the ultimate outcome of the conviction or sentence.

(6) The burden is upon the prisoner to allege in his motion such facts as are necessary to demonstrate that his claims are not procedurally barred under this section.

Miss. Code. Ann. § 99-39-21 (Rev. 2015).

¶10.    The Court analyzes this issue in three parts.

> *A.*     *Carr did not request a new hearing and thus waived the issue on appeal.*

¶11.    Carr failed to timely request a new hearing in a motion before the trial court after ***Carr III***.    Further, Carr failed to timely raise the need for a new hearing in a motion for reconsideration after the trial court entered its revised order.[4]    Therefore, Carr has waived the issue on appeal under Mississippi Code Section 99-39-21(1).    *See* Miss. Code Ann. § 99-39-21(1) (Rev. 2015).    We next consider whether Carr has shown the requisite "cause" and "actual prejudice" necessary to overcome the waiver.

> *B.*     *Carr has not shown "cause" and "actual prejudice" to overcome the waiver.*

¶12.    Section 99-39-21(1) requires "a showing of cause *and* actual prejudice." Miss. Code Ann. § 99-39-21(1) (emphasis added).    Carr claims that caselaw handed down since the 2013 hearing and original order has significantly changed the landscape of ***Atkins*** jurisprudence, thus requiring a new hearing.    We address only the requirement of "actual prejudice," as it is dispositive.

---

[4] Again, while Carr did request a new hearing in his motion for reconsideration after the trial court entered its revised order, the motion for reconsideration was not timely.

¶13.    ***Hall v. Florida*** was decided in May 2014. ***Hall v. Florida,*** 572 U.S. 701, 134 S. Ct. 1986, 188 L. Ed. 2d 1007 (2014). In ***Hall***, the United States Supreme Court reevaluated its *Atkins* jurisprudence and held that Florida's bright-line IQ score cutoff "bars consideration of evidence that must be considered in determining whether a defendant in a capital case has intellectual disability." ***Id.*** at 723. ***Hall*** made clear that an interrelated analysis was required: "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." ***Id.***

¶14.    Here, in its revised order, the trial court noted that Carr's IQ scores—ranging from 70 to 75 —"all fall on or within the margin of error applicable to the test." The trial court then analyzed the testimony of multiple experts and witnesses about Carr's adaptive deficits. In sum, the trial court conducted an interrelated analysis between Carr's IQ score and his adaptive-skill deficits. An interrelated analysis is what ***Hall*** requires. ***Id.*** Moreover, the trial court examined and relied on our opinion in ***Carr III***, which discusses ***Hall*** at length. ***Carr III***, 196 So. 3d at 933–35. Thus, the trial court complied with ***Hall***, and Carr is not entitled to a new hearing.

¶15.    ***Moore I*** was decided in March 2017. ***Moore I***, 137 S. Ct. at 1039. ***Moore I*** examined the Texas Court of Criminal Appeals' use of certain factors in its *Atkins* determinations. ***Id.*** at 1044. The ***Moore I*** Court reiterated that "adjudications of intellectual disability should be 'informed by the views of medical experts'" and that the factors used by the Texas Court

of Criminal Appeals "'creat[e] an unacceptable risk that persons with intellectual disability will be executed.'" *Id.* (alterations in original) (quoting *Hall*, 572 U.S. at 721, 704).

¶16. *Moore I* reiterated *Atkins* and did not alter the *Atkins* landscape. Carr has failed to demonstrate predudice under *Moore I*.[5]

¶17. The Court decided *Russell* in December 2017. *Russell*, 238 So. 3d at 1105. In *Russell*, the Court reversed the trial court and held that the State's request to evaluate Russell before an *Atkins* hearing should have been granted. *Id.* at 1111. The *Russell* Court noted that "our *Atkins* procedures clearly contemplate the State responding to the petitioner's evidence with its own expert opinion." *Id.* Of particular importance in *Russell* was that the State was not denied "a second, duplicate *Atkins* evaluation," but "was requesting *the Atkins* evaluation." *Id.* at 1110 (emphasis in original).

¶18. Here, Carr does not claim that he was denied an *Atkins* evaluation. Further, Carr was evaluated by two experts (including Carr's expert, Dr. Gerald O'Brien), and the trial court examined the testimony of each expert. Because, unlike in *Russell*, Carr was evaluated by his own expert and was able to present testimony, Carr's reliance on *Russell* fails to show actual prejudice.

---

[5] Following the 2017 remand to the Texas Court of Criminal Appeals, the United States Supreme Court has reviewed and clarified *Moore I*. *Moore v. Texas*, 139 S. Ct. 666, 670-72 (2019) ("*Moore II*"). The *Moore I* Court had provided that "[c]linicians . . . caution against reliance on adaptive strengths developed 'in a controlled setting.'" *Moore I*, 137 S. Ct. at 1050 (quoting *Diagnostic and Statistical Manual of Mental Disorders* 38 (5th ed. 2013)). The *Moore II* Court has reiterated its warning from *Moore I*, specifically pointing out that trial courts should rely on adaptive-skill *deficits* rather than adaptive-skill *strengths*. *Moore II*, 139 S. Ct. at 670-72. *Moore II*'s reiteration does not change the analysis here.

¶19.    On a final note, Carr analogizes the case to ***Thompson v. State***, 208 So. 3d 49 (Fla. 2016).  Even though ***Thompson*** is not binding precedent, we address it here for the sake of conclusiveness.  In ***Thompson***, the Supreme Court of Florida remanded the case for a new evidentiary hearing, stating that "Thompson's previous hearing on intellectual disability was tainted by the bright-line cutoff of 70 for IQ scores" that was later denounced by ***Hall***. ***Id.*** at 58 (citing ***Hall***, 572 U.S. at 724).

¶20.    In ***Carr III***, we recognized the unconstitutionality of the bright-line IQ score cutoff and remanded for an interrelated analysis between the significantly subaverage intellectual function and the significant deficits in adaptive behavior.  ***Carr III***, 196 So. 3d at 933–34. In the original order, the trial court considered the second prong and concluded that Carr had adaptive deficits in two skill areas.  However, the trial court then failed to perform an interrelated analysis between the first and second prong.  ***Carr III***'s remand instructions, therefore, were properly aimed at providing clarification of its findings.  Further, in its revised order, the trial court explicitly noted its adherence to ***Carr III*** and at no point indicated it was employing a strict score cutoff.  ***Thompson*** is not analogous to the facts at hand and does not support Carr's assertion of actual prejudice.

¶21.    As stated above, Section 99-39-21(1) requires "a showing of cause *and* actual prejudice." Miss. Code Ann. § 99-39-21(1) (emphasis added).  Considering the recent ***Atkins*** decisions, Carr is unable to establish actual prejudice.  Without actual prejudice, the Court need not address cause.  Carr, therefore, cannot overcome that he waived a new hearing.

> C.      **Carr III** *did not require a new evidentiary hearing on remand.*

8

¶22.   ***Carr III*** held that "a legal standard that views a full-scale IQ score as dispositive of intellectual disability without performing and balancing an interrelated analysis of adaptive functioning, runs afoul of the Eighth Amendment." ***Carr III***, 196 So. 3d at 943.  ***Carr III*** stated that reversal and remand was necessary

> to provide the circuit judge an opportunity to consider whether Carr's adaptive functioning deficits—which the circuit judge found to exist—are so severe that Carr should be ruled intellectually disabled through an interrelated analysis with his IQ scores, which the circuit judge found to be between 70 and 75.

***Carr III***, 196 So. 3d at 944 (footnote omitted).  Nothing in ***Carr III*** mandates a new hearing. Instead, the Court examined the law, including ***Hall***, and directed the trial court to make new factual findings after performing the requisite interrelated analysis.

¶23.   Carr also argues that the ***Carr III*** Court created a new ***Atkins*** standard.  Carr argues that, by remanding the case in 2016 "to provide the circuit judge an opportunity to consider whether Carr's adaptive functioning deficits—which the circuit judge found to exist—are *so severe* that Carr should be ruled intellectually disabled through an interrelated analysis with his IQ scores," the Court created a new standard for determining whether a defendant has an intellectual disability.  ***Id.*** at 943 (emphasis added).

¶24.    In ***Hall***, the United States Supreme Court approvingly cited DSM-5 and quoted the following language: "[A] person with an IQ score above 70 may have *such severe* adaptive behavior problems . . . that the person's actual functioning is comparable to that of individuals with a lower IQ score." ***Hall***, 572 U.S. at 712 (alteration in original) (emphasis added) (quoting *Diagnostic and Statistical Manual  of Mental Disorders* 37 (5th ed. 2013)). The remand order from ***Carr III*** does not conflict with the language cited approvingly in

9

*Hall*. Further, no material difference exists between *Hall*'s instruction to determine whether a defendant has "such severe" adaptive-functioning deficits as to render him or her intellectually disabled through an interrelated analysis and *Carr III*'s instruction to determine whether a defendant's adaptive-functioning deficits are "so severe" to support a finding of intellectual disability. *Hall* and *Carr III* therefore provide the same or substantially similar instruction. We see no reason for a new evidentiary hearing at this juncture.

> **II.    Whether the trial court erred in holding that Carr did not prove by a preponderance of the evidence that he suffers from an intellectual disability that manifested prior to age eighteen.**

¶25.    The Court has recognized that *Atkins* exempts all intellectually disabled people from execution, even those people who are minimally intellectually disabled. *Chase v. State*, 873 So. 2d 1013, 1026 (Miss. 2004) ("*Chase III*") (citing *Atkins*, 536 U.S. at 321). The Court has also recognized that mild intellectual disability "may, under certain conditions, be present in an individual with an IQ of up to 75." *Chase v. State*, 171 So. 3d 463, 471 (Miss. 2015) ("*Chase V*") (quoting *Chase III*, 873 So. 2d at 1028 n.18). Further, in 2015, following the Supreme Court's guidance in *Hall* and accounting for "the medical community's evolving understanding of intellectual disability and its diagnosis," *Chase V* adopted "the 2010 [American Association on Intellectual and Developmental Disability (AAIDD)] and 2013 [American Psychiatric Association (APA)] definitions of intellectual disability as appropriate for use to determine intellectual disability in the courts of this state in addition to the definitions promulgated in *Atkins* and *Chase*." *Chase V*, 171 So. 3d at 471; *see also Hall*, 572 U.S. at 710 ("In determining who qualifies as intellectually disabled, it is proper to consult the medical community's opinions."). In *Chase V*, we noted that "[t]he new

10

definitions have not materially altered the diagnosis of intellectual disability but have provided new terminology." *Id.* (citing *United States v. Williams*, 1 F. Supp. 3d 1124, 1146 (D. Haw. 2014)).

¶26.   The AAIDD articulates the skills domains as follows:

> The conceptual skills domain includes "language; reading and writing; and money, time, and number concepts."   The social skills domain includes "interpersonal skills, social responsibility, self-esteem, gullibility, naïveté (i.e., wariness), follows rules/obeys laws, avoids being victimized, and social problem solving."   The practical skills domain includes "activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone."

*Chase V*, 171 So. 3d at 469 (citations omitted).   The APA states,

> The *conceptual (academic)* domain involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problems solving, and judgment in novel situations, among others.   The *social domain* involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others.   The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others.

*Chase V*, 171 So. 3d at 469–70 (quoting *Diagnostic and Statistical Manual of Mental Disorders* 37 (5th ed. 2013)).   While some differences exist in the standards articulated by the AAIDD and APA, "'the exact wording of the . . . standards 'makes little substantive difference in the context of *Atkins*,'" since all "are similar and require the same three basic elements . . . significantly subaverage intellectual functioning, significant deficits in adaptive behavior, and manifestation before age eighteen."   *Chase V*, 171 So. 3d at 470 (quoting

11

*Williams*, 1 F. Supp. 3d at 1146).  Moreover, *Chase V* provided specific guidance on Mississippi's application of "significant deficits in adaptive behavior." *Id.*  We stated,

> For the diagnosis of intellectual disability, significant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population, including people with disabilities and people without disabilities. On these standardized measures, significant limitations in adaptive behavior are operationally defined as performance that is approximately two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical or (b) an overall score on a standardized measure of conceptual, social, and practical skills. The assessment instrument's standard error of measurement must be considered when interpreting the individual's obtained scores.

*Chase V*, 171 So. 3d at 486 (quoting *Intellectual Disability: Definition, Classification, and Systems of Support* 43 (11th ed. 2010)).

¶27.    In *Carr III*, we followed *Chase V*'s guidance, reasserting Mississippi's adoption of both the definitions from the AAIDD and the APA.  *Carr III*, 196 So. 3d at 933 (citing *Chase V*, 171 So. 3d at 471).  Further, we recognized that "significant deficits in one of the three adaptive-functioning domains are required," which include the conceptual-skills domain, the social-skills domain, and the practical-skills domain.  *Id.* at 933 (citing *Chase V*, 171 So. 3d at 469).

¶28.    Here, the trial court reviewed our *Carr III* decision and restated the correct legal standard addressing the three prongs of the test. *See Carr III*, 196 So. 3d at 933.  Further, the trial court correctly noted that "[t]here is some amount of interplay between two of the criteria: (a) significantly sub-average intellectual function, and (b) significant deficits in adaptive behavior."   The trial court also noted that "although an individual may possess an IQ above what is normally considered appropriate for a finding of intellectual disability, the

12

deficits in such an individual's adaptive behavior might be so severe that a finding [of] intellectual disability may still be made or even compelled." We review the trial court's analysis of each prong of the *Atkins* test separately.

### 1. Significantly subaverage intellectual function

¶29. The trial court analyzed the first prong as follows:

> [T]he three IQ tests administered to Carr resulted in IQ determinations of 70, 72, and 75. These scores all fall on or within the margin of error applicable to the test. They are not so dramatically low or high to be strongly suggestive either way on the issue of intellectual disability. This is significant because, "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability . . . ."

The trial court did not make a specific finding as to the existence of significantly subaverage intellectual functioning at this juncture in its analysis, because doing so was not necessary. The only factual finding the trial court needed to make—which it did in light of the evidence presented—was that the "scores all fall on or within the margin of error applicable to the test." Having done so, the trial court properly utilized the correct legal standard, and we cannot say that its findings amounted to clear error. *See Hall*, 572 U.S. at 723; *see also Carr III*, 196 So. 3d at 934.

### 2. Significant deficits in adaptive behavior

¶30. The trial court correctly described each of the three domains: conceptual, social and practical and recognized that "[s]ignificant deficits in one of the domains is required." The trial court then examined the testimony of three different witnesses to determine whether Carr exhibited significant deficits in adaptive behavior. Specifically, the trial court reviewed

13

the testimony of Dr. Gilbert Macvaugh, the State's expert witness, Dr. O'Brien, Carr's expert witness and Johnnie Chaney, a childhood associate of Carr's.

¶31.   Discussing adaptive-deficit testing, the trial court stated that, "[a]ccording to Dr. Macvaugh, such tests were not designed to assess individuals who have been incarcerated in a heavily structured environment such as exists in jails/prison."  The trial court noted that "[u]ltimately, Macvaugh agreed that Carr exhibited deficits in the areas of functional academics, employment, and perhaps social."  The trial court also considered the testimoney of Carr's expert stating, "Dr. O'Brien found deficits in all three domains and in 8 of the 10 adaptive skills" and explicitly "addressed the areas of communication, self-direction, leisure, social, community use and work and found deficits in all such areas."  Further, the trial court noted Johnnie Chaney's testimony but found it to be a "mixed bag," ultimately determining that "the issue came down more to the testimony and credibility of the experts."  It then found that Carr had not shown significant adaptive-skill deficits.

¶32.   Carr argues that the trial court's original order held that Carr had at least two of the adaptive-functioning deficits.  Carr also argues that the "so severe" language has changed the standard to require "super deficits" in adaptive functioning.  We disagree.

¶33.   First, as concluded above, *Carr III*'s "so severe" language does not create a new standard requiring "super deficits." *See **Hall***, 572 U.S. at 712 (alteration in original) ("[A] person with an IQ score above 70 may have such severe adaptive behavior problems . . . that the person's actual functioning is comparable to that of individuals with a lower IQ score." (quoting *Diagnostic and Statistical Manual of Mental Disorders* 37 (5th ed. 2013))).

14

¶34.    Second, while the trial court did originally find that "Carr has demonstrated adaptive skill deficits in at least two (2) of the adaptive skill areas," the trial court did not find *significant* adaptive-skill deficits.  Under **Chase V**, adaptive-skill deficits require a showing of "significant limitations in adaptive behavior" that "should be established through the use of standardized measures normed on the general population, including people with disabilities and people without disabilities." **Chase V**, 171 So. 3d at 486 (quoting *Intellectual Disability: Definition, Classification, and Systems of Support* 43 (11th ed. 2010)). Specifically, **Chase V** provided that the "significant limitations in adaptive behavior are operationally defined as performance that is approximately two standard deviations below the mean . . . ." **Id.** (quoting *Intellectual Disability: Definition, Classification, and Systems of Support* 43 (11th ed. 2010)).[6]

¶35.    The **Chase V** Court also considered that none of the experts had performed the adaptive-deficits analysis properly, noting that Dr. Macvaugh, who was one of the experts, had written an article on the importance of using normed data. **Id.** (citing Macvaugh, G.S., & Cunningham, M.D., *Atkins v. Virginia: Implications and Recommendations for Forensic Practice,* 37 J. of Psychiatry & the Law 131, 168 (2009)). The **Chase V** Court concluded that because the burden rested on Chase, the trial court's finding that Chase had failed to prove intellectual disability did not constitute clear error. **Chase V**, 171 So. 3d at 486. **Carr III** did

---

[6] The **Moore II** decision also described the clinical approach to determining the significance of adaptive deficits: "clinicians look to whether an individual's adaptive performance falls two or more standard deviations below the mean in any of the three adaptive skill sets (conceptual, social, and practical)." **Moore II**, 139 S. Ct. at 668 (quoting **Moore I**, 137 S. Ct. at 1046).

15

not review *Chase V*'s emphasis on normed data. However, in requiring the trial court "to consider whether Carr's adaptive functioning deficits—which the circuit judge found to exist—are so severe that Carr should be ruled intellectually disabled through an interrelated analysis with his IQ scores, which the circuit judge found to be between 70 and 75," *Carr III* supported *Chase V*'s requirement. *Carr III*, 196 So. 3d at 943-44 (footnote omitted).

¶36. In sum, the trial court did as *Carr III* instructed. In weighing the testimony, the trial court considered Carr's adaptive deficits in an interrelated analysis with Carr's IQ scores and concluded that the deficits were not significant in nature. Further, because no expert employed the use of normed data, we conclude, as we did in *Chase V*, that the trial court's rejecting Dr. O'Brien's testimony and finding that Carr had not proved intellectual disability by preponderance of the evidence was not clear error.

### 3. *Manifestation before age 18*

¶37. Carr argues that the trial court has still failed to issue a finding on the third prong. Under the trial court's revised analysis and findings on the second prong, analysis on the third prong was not required. *Hall*, 572 U.S. at 723. However, the trial court did properly analyze the third prong. Therefore, we disagree.

¶38. In *Carr III*, we stated, "Because the circuit judge found that adaptive functioning deficits existed based on evidence which largely focused on Carr's academic performance before age eighteen, we instruct the trial court to review its findings on this prong upon remand." *Carr III*, 196 So. 3d at 943 n.10. The trial court considered the credibility of the witnesses, their testimony and the evidence regarding Carr's schooling and determined that

16

"Carr failed to show by a preponderance of the evidence that he was suffering from an intellectual disability that had manifested itself prior to the age of 18."

¶39. Just as *Carr III* directed, the trial court considered and weighed all of the evidence presented and made a reasoned finding that Carr had failed to meet his burden. Specifically, the trial court did not ignore any of the testimony but weighed it. *See Brown v. State*, 168 So. 3d 884, 894 (Miss. 2015) (distinguishing between a trial judge's weighing testimony and his not ignoring it). Thus, because we "give deference to the trial judge as the ultimate finder of fact," we do "not reweigh the evidence on appeal," and we conclude that no clear error exists. *Id.*

## CONCLUSION

¶40. Carr's argument for a new hearing is waived on appeal and, notwithstanding the waiver, is without merit. Further, the trial court's rejecting Dr. O'Brien's testimony and finding that Carr had not proved intellectual disability by preponderance of the evidence was not clear error. Finally, the trial court properly revisited the third prong of the *Atkins* test as required by the remand order in *Carr III*. Therefore, we affirm the decision of the trial court holding that Carr is not intellectually disabled.

¶41. **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, BEAM AND GRIFFIS, JJ., CONCUR. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J., AND ISHEE, J.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶42. Considering the totality of the evidence presented, I would hold that the trial court clearly erred in its finding that Carr failed to prove by a preponderance of the evidence that

17

he was intellectually disabled within the parameters of *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002). Accordingly, I dissent from the majority's affirmance of the trial court's decision and would reverse the trial court's ruling and render judgment in favor of Carr.

¶43.    The United States Supreme Court, in *Atkins*, concluded that, construing the Eighth Amendment "in the light of our 'evolving standards of decency,'" the capital punishment of intellectually disabled offenders is unconstitutional and constitutes cruel and unusual punishment. *Id.* at 321 (quoting *Ford v. Wainwright*, 477 U.S. 399, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986)). As the majority states, the *Atkins* decision exempts even those who are *minimally* intellectually disabled from execution. *Chase v. State*, 171 So. 3d 463, 467 (Miss. 2015) (*Chase V*) (emphasis added) (quoting *Chase v. State*, 873 So. 2d 1013, 1026 (Miss. 2004) (*Chase III*)). Intellectual Disability is "characterized by significant limitations in both intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills." *Chase V*, 171 So. 3d at 469 (quoting *Intellectual Disability: Definition, Classification, and Systems of Support* 1 (11th ed. 2010)).

¶44.    At the conclusion of an *Atkins* hearing, the trial court must determine "whether the defendant has established, by a preponderance of the evidence, that the defendant" is intellectually disabled. *Chase III*, 873 So. 2d at 1029. "Preponderance of the evidence in Mississippi, as elsewhere, simply means that evidence which shows that the fact to be proved is more probable than not." *Gardner v. Wilkinson*, 643 F.2d 1135, 1137 (5th Cir. 1981). "This burden simply requires the greater or more convincing evidence. The burden is far less than clear and convincing evidence or beyond a reasonable doubt." *City of Meridian v.*

18

*Hodge*, 632 So. 2d 1309, 1314 (Miss. 1994) (Smith, J., dissenting). Due to the irreversible nature of capital punishment, "[t]horoughness and intensity of review are heightened in cases where the death penalty has been imposed." *Irving v. State*, 361 So. 2d 1360, 1363 (Miss. 1978) (citing *Augustine v. State*, 201 Miss. 731, 29 So. 2d 454, 454 (1947)).

## I. Intellectual Functioning

¶45. Subaverage intellectual functioning is measured by intelligence quotient (IQ). *Chase III*, 873 So. 2d at 1021. "[I]ntellectual disability 'may . . . be present in an individual with an IQ of up to 75.'" *Chase V*, 171 So. 3d at 468 (quoting *Chase III*, 873 So. 2d at 1028 n.18). Here, Carr established that his IQ scores fell within the range that can indicate intellectual disability. Dr. William Kallman first evaluated Carr for intellectual disability in 1990, when Carr was twenty-five years old. Dr. Kallman found that Carr had a performance IQ of 63 and a verbal IQ of 72, for a Full Scale IQ of 70. Dr. Kallman stated that Carr's score was in the mildly intellectually disabled range on the Wechsler Adult Intelligence Scale–Revised (WAIS-R). Dr. Kallman concluded that Carr was functioning in the mildly intellectually disabled range in intelligence and that Carr's "performance on the IQ test and the neuropsychological screening instruments are all indicative of someone who is functioning at a relatively low level cognitively." He found that "there were no signs of malingering or intentional efforts to distort the data" and stated that Carr's deficits were spread across all areas and were nonspecific.

¶46. The Forensic Unit at Mississippi State Hospital (MSH) evaluated Carr in 2009, when he was forty-four years old, and administered two IQ tests. The MSH report, signed by Dr. Gilbert S. Macvaugh III, stated that Carr achieved a Full Scale IQ of 72 on the WAIS-IV. On

the Stanford-Binet Intelligence Scales, Fifth Edition (SB5), Carr scored a Full Scale IQ of 75. Like Dr. Kallman, the MSH report found that Carr did not appear to be malingering cognitive deficits. Dr. Macvaugh also stated that Carr's IQ scores would have been even lower had they been adjusted downward due to the Flynn Effect. The Flynn Effect "is a phenomenon positing that, over time, standardized IQ test scores tend to increase with the age of the test without a corresponding increase in actual intelligence in the general population." *Thorson v. State*, 76 So. 3d 667, 672 (Miss. 2011) (quoting *Wiley v. Epps*, 625 F.3d 199, 203 n.1 (5th Cir. 2010)). The MSH report concluded that Carr's test scores did not rule out the possibility of a diagnosis of mild intellectual disability. In addition, Dr. Gerald O'Brien, a licensed psychologist, issued a report on April 6, 2012, in which he stated, with a reasonable degree of certainty, that Carr met the intellectual-functioning prong of intellectual disability.

¶47.    Each of Carr's IQ scores fell within the range that can indicate intellectual disability. Because Carr proved by a preponderance of the evidence that his IQ was 75 or below, the trial court must address the second *Atkins* prong—significant deficits in adaptive functioning. *Thorson*, 76 So. 3d at 683.

**II.    Significant Limitations in Adaptive Behavior**

¶48.    The American Association on Intellectual and Developmental Disability (AAIDD)

> defines each domain of adaptive functioning. The conceptual skills domain includes "language; reading and writing; and money, time, and number concepts." The social skills domain includes "interpersonal skills, social responsibility, self-esteem, gullibility, naïveté (i.e., wariness), follows rules/obeys laws, avoids being victimized, and social problem solving." The practical skills domain includes "activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation,

20

schedules/routines, and use of the telephone." For a diagnosis of intellectual disability, an individual must have significant deficits in one of the three adaptive functioning domains.

*Chase V*, 171 So. 3d at 469 (citations omitted). I believe that Carr presented overwhelming evidence that he had significant deficits in several domains of adaptive functioning.

¶49.    Dr. O'Brien concluded that Carr was considered to be intellectually disabled consistent with both *Atkins* and *Chase*. Dr. O'Brien found that Carr's reports indicated "significant deficits in *all three* adaptive types or domains defined by the AAIDD, and in *eight of the ten* included skill areas. . . ." (Emphasis added.) Dr. O'Brien stated that Carr's deficits were "in the *conceptual* domain (including communication, functional academics, and self-direction), the *social* domain (including leisure and social skills), and the *practical* domain (including home living, health and safety, and self-care)." In addition, the MSH report stated that Carr may have demonstrated significant limitations in *at least* two areas of adaptive behavior before the age of eighteen, functional academics and work.

¶50.    In the conceptual domain of adaptive deficits, competence in reading, writing, and math reasoning become probative. Dr. Victoria Swanson, a licensed psychologist, evaluated Carr in 2010, when Carr was forty-four years old. Even at age forty-four, Dr. Swanson found that Carr was operating on a mostly fourth-grade level. Carr scored at a fourth-grade level on Brief Achievement, Brief Reading, Brief Math, and Academic Skills. Carr's highest score was in Broad Reading and was at only a fifth-grade level.

¶51.    Dr. Kallman testified that Carr's IQ and achievement testing indicated that he

> doesn't have very good cognitive skills, he doesn't understand a whole lot of what goes on around him, he doesn't have a lot of basic living skills, such as simply arithmetic and reading abilities, and . . . Well, this person would have

21

great difficulty functioning independently in the world unless it was a fairly simple task that did not require a lot of intellectual understanding and activity.

¶52. Carr's school records also indicate significant deficits in functional academics. Carr failed the third, seventh, and ninth grades and dropped out of school at age seventeen after his second attempt at ninth grade. In addition, his grades were poor throughout the whole of his school years. As the MSH report stated, Carr's grades as a whole ranged "from failing to barely passing in most subjects. . . ." In the fifth grade, Carr's standardized testing scores mostly were at the second-grade academic level. On standard achievement tests administered in the eighth grade, Carr obtained national percentile rankings which ranged from the first percentile to the thirty-sixth percentile. Carr's reading standard score in the eighth grade was in the .8 percentile, meaning that more than 99 percent of students taking the test scored higher in reading than Carr. Similarly, in math over 99 percent of students ranked higher than Carr, and 99 percent of students scored higher in spelling than Carr. Thus even Carr's best standardized test score was lower than 64 percent of the students who took the test. Carr's national percentile was ten, which meant that 90 percent of students taking the test scored higher than Carr.

¶53. The MSH report concluded that Carr *probably* demonstrated adaptive-behavior deficits in the area of functional academics prior to the age of eighteen. Dr. Macvaugh found probative that Carr had failed the third, seventh, and ninth grades. In addition, it noted that Carr's grades had been "quite poor, ranging from failing to barely passing in most subjects throughout his school years." However, Dr. Macvaugh was concerned with Carr's absences from school. Although the trial court also was concerned about Carr's poor attendance, even

22

when Carr repeated grades, he continually maintained poor marks in school. In addition, Carr's IQ scores continually have remained around the same significantly low level.

¶54.   Carr also presented sufficient evidence to show significant deficits in the social-skills domain. Dr. Kallman's report stated that Carr's personalty assessment suggested that he was a "severely disturbed individual who has been in a state of extreme emotional turmoil for most of his life." He additionally reported that Carr's profile was "consistent with others who are labelled [sic] 'dangerous psychotics.'" Although the MSH report took issue with Dr. Kallman's suggestion that Carr may have been exaggerating symptoms of mental illness, Dr. Kallman repeatedly stated in his report that the evaluation was a valid indicator of Carr's current state of cognitive and emotional functioning. Dr. Kallman additionally stated that "[t]here were no signs of malingering or intentional efforts to distort the data."

¶55.   Carr additionally presented testimony from Johnie Chaney, a childhood acquaintance of Carr's. Chaney testified that when Carr was approximately fifteen or sixteen, Chaney would have to help him "keep his clothes right on him." Chaney testified that he would have to tell Carr to tie his shoes and to clean up when he had "an odor." Dr. O'Brien testified that Chaney's testimony was consistent with his own opinions regarding Carr's deficits. The trial court found probative the portion of Chaney's testimony in which he stated that Carr had played softball with other young people. And Chaney did state that Carr could play softball in the outfield, however, he additionally stated that he had to tell Carr to run and catch the ball. Chaney also testified that Carr got along with everybody only when they were not trying to take advantage of him or trying to make him do crazy things. Therefore, I disagree with

23

the trial court's contention that Chaney's testimony was not helpful and would find that Chaney's testimony showed additional deficits in Carr's social and practical skills.

¶56.   Dr. Macvaugh stated that Carr also may have demonstrated significant limitations relating to work. He stated that he did not have access to information to confirm the validity of Carr's work experience and that it was unclear whether he experienced difficulty relating to work. However, Carr clearly could not hold a steady job. Before the age of twenty-five, Carr's various positions included chopping cotton, working as a janitor, working at a tire shop performing tire rotations, reading meters with the water department,  working on boat motors, and working at service stations and clubs. Dr. Macvaugh's lack of access to information from Carr's former employers did not cancel out Carr's broken work history, which Dr. Kallman also noted.

¶57.   Considering the totality of the evidence presented, I would find that the trial court erred in its ruling that Carr failed to prove by a preponderance of the evidence that he suffered from significant adaptive deficits.

### III.   Prior to Age Eighteen

¶58.   Lastly, Carr presented sufficient evidence that his adaptive deficits did in fact manifest prior to age eighteen. On remand, the trial court wrote that "there is no evidence that Carr was administered an IQ test prior to age 18." In addition, the MSH report stated that,

> [i]n summary, Mr. Carr does, in our opinion, have intellectual limitations and may very well have met the diagnostic criteria for [intellectual disability] before the age of 18. However, we cannot be certain of this because he never received intelligence testing or a standardized assessment of his adaptive functioning before age 18.

24

Yet Carr must not be penalized because he was not given an IQ test before his eighteenth birthday. As Dr. O'Brien stated, "there's almost never an IQ test in a case like this before the age of 18. . . . But we do have what you might call collateral information about his academic functioning which is strongly suggestive of an IQ score in the range we're talking about." Thus, while Carr was not given a formal IQ test before he turned eighteen, he presented clear evidence indicating his IQ and adaptive deficits prior to age eighteen—testimony from family and friends and his school grades.

¶59.   Dr. O'Brien reported that he definitively found that Carr's deficits existed prior to age eighteen. Dr. O'Brien testified that, at about the third-grade level, Carr started reaching the end of his academic potential. Carr "reached the limit at which he could no longer keep up with the average student in that school. . . ." Dr. O'Brien additionally found that Carr was not considered to have been deceptive or malingering during any ability testing. Carr's IQ scores after he turned eighteen also present evidence of his intellectual functioning prior to his turning eighteen. *See Rivera v. Quarterman*, 505 F.3d 349, 363 (5th Cir. 2007) ("And, although Rivera did not take the WAIS-III test prior to age 18, the district court found that the combination of his score of 68, other evidence of Rivera's intellectual functioning, and his performance in school 'establish that Rivera had significantly subaverage intellectual functioning prior to the age of 18.'"). Seven years after Carr turned eighteen, Dr. Kallman established that Carr had an IQ score of 70.

¶60.   Chaney testified that when Carr was approximately fifteen to sixteen, he had to tell Carr when to tie his shoes and when he had an odor. Carr's sister, Annette Carr, stated that Carr was slow growing up and that he never lived independently. Carr's sister, Sarah Carr

25

Jefferson, also thought that Carr was slow and had mental-health problems. Sarah stated that Carr would sometimes talk to dogs and that the dogs talked to him when he was young. Carr's former school teacher stated that she taught Carr in the fifth and sixth grades and that Carr was a slow learner and a poor student. She attributed this to his home environment and his attitude.

¶61. In addition, in its opinion remanding this case to the circuit court, this Court stated that the trial court had found "that adaptive functioning deficits existed based on evidence which *largely focused on Carr's academic performance before age eighteen . . . .*" *Carr III*, 196 So. 3d at 943 n.10 (emphasis added). This Court then instructed the trial court to review its findings on whether Carr's adaptive functioning deficits existed prior to age eighteen. *Id.* Thus, this Court's own language on remand strongly indicated that Carr had in fact shown adaptive-functioning deficits before he turned eighteen.

## IV.    Summary

¶62. As previously stated, *Atkins* prohibits the death penalty for those who are even *minimally* intellectually disabled. The standard in this case was the preponderance of the evidence. A preponderance of the evidence does not require proof beyond doubt nor does it require even convincing proof. *Producers Gin Ass'n v. Beck*, 215 Miss. 263, 60 So. 2d 642, 644 (1952). A preponderance of the evidence means exactly that—the greater weight of the evidence.

¶63. Carr presented a report and testimony from Dr. O'Brien, who found to a reasonable degree of psychological certainty that Carr was intellectually disabled. In addition, Dr. Kallman also found that Carr was functioning in the mildly intellectually disabled range. Carr

26

presented evidence of Dr. Swanson's testing that indicated Carr was functioning on a mostly fourth-grade level, which was corroborated by Carr's school records. And although Dr. Macvaugh concluded that overall he was "unable to form an opinion to a reasonable degree of psychological and psychiatric certainty regarding whether or not Mr. Carr is [intellectually disabled] as defined by" *Atkins* and *Chase*, even he agreed that Carr may have demonstrated significant limitations in *at least* two areas of adaptive behavior before the age of eighteen.

¶64. This is not even a case of opposing experts. The evidence showed that one expert stated Carr *could* be intellectually disabled but that he was not certain. Yet Carr presented evidence from two experts stating that he was intellectually disabled, presented school records that showed significant academic deficits, presented testimony indicating that Carr had to be told when to tie his shoes and when to bathe, and presented IQ tests showing significant intellectual deficits. Because the death penalty is final and cannot be reversed, all doubts are to be resolved in favor of the accused. *Lynch v. State*, 951 So. 2d 549, 555 (Miss. 2007). Resolving all doubts in favor of Carr, clearly the greater weight of the evidence showed that Carr was intellectually disabled within the meaning of *Atkins*. I would find that the trial court erred in its finding that Carr failed to prove his intellectual disability claim by a preponderance of the evidence.

¶65. Carr established that his IQ scores each fell within the margin of error applicable to the test, that he had significant adaptive deficits in more than one area, and that those deficits manifested before the age of eighteen. Accordingly, I would reverse the trial court's ruling on intellectual disability and would render judgment in favor of Carr.

**KITCHENS, P.J., AND ISHEE, J., JOIN THIS OPINION.**

27